## LEM TATE v. THE STATE.

No. 1634. Decided November 3, 1897.

**1. New Trial—Where the Jury Has Received Other Testimony.**
On a trial for murder, where the testimony of a most material witness for the State has been attacked by a strong attempt on the part of defendant to break it down, and after the retirement of the jury one of the jurymen stated that he knew said witness, that he had worked for him, and was an honest and truthful boy, etc.; Held, that to thus bolster up and give strength and character to the credit of a material witness by a member of the jury, when defendant was deprived of his right to cross-examine the juror, was violative of the fundamental principles underlying the right of trial by jury. Following Mitchell v. State, 36 Texas Crim. Rep., 278.

2. Jury—Discussion of Defendant's Failure to Testify—Construction of Statute.

The statute, article 770, Code Criminal Procedure, which declares, that defendant's failure to testify shall not be taken as a circumstance against him, etc., has reference to every part of the trial, and especially are the jury inhibited from considering his failure to testify as a circumstance against him, because they constitute the triors in every criminal case and the language of the statute would appear to be directly aimed at them.

3. Suggestions to Trial Judges as to Misconduct of Juries.

It is suggested that district judges call the attention of the jury to the oath they have taken and admonish them against going outside the record in the trial of any case, and, on a disregard of such admonition, to visit such punishment as would put an end to the practice.

APPEAL from the District Court of Clay. Tried below before Hon. GEORGE E. MILLER.

Appeal from a conviction for murder in the second degree; penalty assessed being five years imprisonment in the penitentiary.

Appellant was indicted for the murder of one Virgil Risley by shooting him with a pistol in Clay County, on the 4th day of May, A. D. 1896.

In view of the questions discussed and upon which the appeal is disposed of by the opinion, it is not necessary to give a general statement of the case as made by the statement of facts.

*Stine, Chesnutt & Hurt*, for appellant.—The receiving of evidence by the jury after retiring to consider of their verdict that might have influenced, or that was capable of influencing them, in their verdict, is ground for a new trial, though no actual prejudice be shown, and though the jury should think that they were not influenced by it. 36 S. W. Rep., 456; 4 Yerger (Tenn.), 111; 6 Humph. (Tenn.), 275; 1 Swann (Tenn.), 62; 11 Lea (Tenn.), 694; 29 Conn., 100; 76 Am. Dec., 595; 103 Cal., 193; 5 Pick., 296; 46 Wis., 248; Conrad v. State, 43 N. E. Rep., 221; 6 Texas Criminal App., 524; 45 Texas, 2; 36 S. W. Rep., 930.

The fact that defendant does not testify can not be taken by the jury as a circumstance against him. Code Crim. Proc., art. 770.

*James F. Carter*, District Attorney, and *Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years; hence this appeal.

The only question that we deem necessary to consider is presented by appellant's motion for a new trial, and consists in the alleged misconduct of the jury in hearing testimony not in the presence of the court, and after their retirement to the jury room. Appellant sought a new trial because, while in the jury room considering of their verdict, one of the jurors, to wit, J. W. Colburn, stated to another juror, J. H. Stroud, in the hearing of others of the jury, that the witness Spry had worked for

him (Colburn), and that he (Colburn) knew said witness Spry to be an honest and truthful boy, and that said Spry would not willingly tell anything that was not true, and that the reason that said Spry could not read before the jury was because he was unnerved by the court requiring him to read there; that he (Colburn) knew that the said Spry could read. The motion shows that said Spry was an important witness for the State. It also shows in what respect he was important. It further shows that during the progress of the trial, and while said Spry was on the stand, he claimed to be able to read, but, being called on by the court, and asked to read from a book, was unable to do so. This motion for a new trial has appended to it the affidavits pro and con of other jurors, and the court also heard testimony upon the issue. Some of the jurors for the State qualify the remarks made by Colburn, and some for the defendant state the remarks were made substantially as contained in the motion. The jurors also disagree as to whether or not this statement made in the jury room had any effect on any of the jurors; those for the State showing that it had no such effect. Berpo and one or two others testify that the statements made in the jury room did have an effect to induce them to agree to the verdict. In order to present this question properly we will state enough of the testimony so that it may be seen what bearing the evidence of the witness Spry may have had upon any issue involved in the case. The State's testimony tended strongly to show that the homicide was the result of a conspiracy between Hiram Curtis, Ransel Orman, and defendant; that Curtis, who was the leader of the conspiracy, had formed a grudge against one Mat Bentley; that on the night of the homicide there was a party in the neighborhood, at the house of Risley; that Bentley was there, and a number of others, engaged in dancing; that Curtis, accompanied by defendant and Orman, came to the house, went in the room where Bentley was, and ordered him to leave, which he declined to do, and Curtis and Tate immediately drew their pistols and commenced firing on him. Bentley stood in one corner of the room, and these parties were seen to fire in his direction. Bentley returned their fire, and a great deal of confusion ensued. A number of parties present ran out of the room and out of the house. Virgil Risley (deceased) was near a window in the south end of the room, endeavoring to make his exit at the time he was shot, and this position placed him out of range of the firing by Curtis and Tate at Bentley, but rather in range of Bentley's firing. The theory advanced by the State is that Risley was not shot by Bentley, but was shot by someone on the outside of the house; and to support this theory Spry and one other witness testified that they saw Orman fire into that south window from outside of the house. One or two witnesses also testified that they saw Curtis fire from the outside of the house. A number of witnesses testified, that after the firing began in the house Orman left and went outside, and Tate, as well as Curtis, also left. Curtis was found, shortly after the firing ceased, in an expiring condition, at the southwest corner of the house. The deceased, Risley, was found wounded near the window after the firing ceased, the ball hav-

ing entered his stomach. In the statement made by deceased shortly after he was shot, he stated that he was shot from the outside of the house. Now, if Tate in the difficulty fired the shot that killed Risley, or if Orman or Curtis fired that shot, he would be equally guilty; and the case was tried for the State upon this theory, so that the evidence of Spry, who testified that when the firing began he ran out of that room, and around to the south end of the house, and saw Ransel Orman at a little tree a few feet from the south window fire into the room through that south window, where it is said deceased was shot, became very important testimony; the theory of the defendant being that Bentley, or someone else not of defendant's party, fired the shot that killed Risley. The importance of this testimony appeared to defendant on the trial of the case, and he attempted to break down the evidence of Spry on cross-examination. He showed that on a former trial the witness stated that he did not understand the nature of an oath, but on this trial the witness stated that he knew the nature of an oath and that he had learned it since the preliminary trial by having read the oath; yet when a book was presented to him by the defendant, although insisted upon by the court, he was unable to read from it. Whether or not it would have been competent for the State to have introduced evidence, and shown the reputation of Spry as being a truthful witness, it is not necessary to discuss, for, if it was competent, the only place that such testimony could have been offered was on the trial, and before the jury, so that the witnesses might have been subject to cross-examination. This course was not pursued, but it seems that, after the jury had retired, one of their number (Colburn) stated to the jury that he knew the witness Spry, that he had worked for him, and that he was an honest and truthful boy; and, even when questioned as to his inability to read, the juror explained that to the jury by stating that he knew he could read but that he was excited and unnerved in the presence of the court. It is impossible to consider these statements made to the jury as otherwise than material, for they gave strength and character to the credit of a witness before the jury by a member thereof, and that, too, when defendant had no opportunity to cross-examine said juror as to his means of knowledge, etc. The testimony of said witness on behalf of the State was upon a critical issue in the case, and the jury themselves appear to have thoroughly appreciated this fact, as they could not fail to do from the charge of the court; and to thus permit a witness to be bolstered up in the jury room, in the absence of the defendant, would be violative of the fundamental principles which underlie a jury trial, by which every defendant is guaranteed a fair and impartial trial. We have heretofore discussed this question thoroughly in the case of Mitchell v. State, 36 Texas Criminal Reports, 278, and it is only necessary here to refer to the principles therein laid down, as they are decisive of this question.

As one of the grounds for a new trial, appellant urged the misconduct of the jury after their retirement to the jury room in discussing the failure of the defendant to testify on his own behalf. The motion shows

that one of the jurors, whose name was unknown to the defendant, asked his fellow jurors while they were in the jury room deliberating on their verdict, why the defendant was not put on the witness stand, and that J. R. Brummett, one of the jurors, stated to his fellow jurors that, if the defendant had testified, when cross-examined by the district attorney he would have been bound to convict himself by his own testimony; and that several of the other jurors whose names are unknown to the defendant, argued that he did not dare to go on the stand and testify; and that his failure to testify was otherwise discussed, and taken as a circumstance against him, and that the jury were thereby influenced to render a verdict against him. It appears that the court tried this issue upon affidavits and evidence. Brummett, in his affidavit, states that, after the jury retired to the jury room they discussed the fact of the failure of the defendant to testify, and considered that fact against him; that one of the jurors asked why the defendant was not put on the stand, and Brummett stated that, if he had testified, when cross-examined by the district attorney, he would have been bound to convict himself by his own testimony; and several of the other jurors argued that the defendant did not dare to go on the stand to testify. On his examination, however, this juror stated that he did not say in the jury room that, if defendant had gone on the stand, he would have convicted himself by his own testimony, but that he asked why defendant did not go on the stand; that Orman went on the stand; "and that, if he (defendant) had testified, I would have considered his testimony." This was all the evidence taken by the court on this issue. From this it would seem that the failure of the defendant to testify on his own behalf was mentioned, if not discussed, in the jury room. Our statute provides (Code of Criminal Procedure, article 770): "Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented upon by counsel in the cause," etc. Now, we take it that a proper construction of this statute has reference to every part of the trial, and especially are the jury inhibited from considering the defendant's failure to testify as a circumstance against him, because they constitute the triors in every criminal case, and the language of the statute would appear to be directly aimed at them. We are left in the dark as to the extent of the discussion of this matter in the jury room, nor are we informed that it had any particular effect as against the defendant; but we are constrained to believe that, as the matter appears from the record in this case, it must have been used to his detriment. As stated above, the statute is plain in its terms, and it does not stop to estimate the question of injury; it inhibits the failure of the defendant to testify from being used as a circumstance against him; and this court has often reversed cases where this matter was discussed by counsel for the State before the jury. In our opinion, the same rule would apply where the matter was discussed by the jury after their retirement. For the errors discussed, this case must be reversed.

The record discloses an absolute fairness of trial, and a proper administration of the law up to the submission of this case to the jury, and the reversal is based solely upon their misconduct. It occurs to us that when this matter was presented to the judge below it was his bounden duty, after the proof was submitted, to have granted a new trial, and not have compelled defendant to seek redress by an appeal to this court. In granting that new trial, he should have definitely ascertained who of the jurors were guilty of thus tampering with justice, and have visited upon such the summary punishment authorized by law as for a contempt of his court. One such punishment properly visited would do much to arrest this vicious practice, and to teach jurors a lesson that they should be governed entirely and exclusively by the oath assumed by them when they enter upon the trial of the case; that is, to try the case solely upon the law and the evidence submitted to them. This court has been compelled to reverse not a few cases on account of the misconduct of juries in going outside the record, and then afterwards making affidavits publishing their disregard of the obligations assumed by them when they were sworn as jurors. We would suggest that the district judges hereafter call the attention of the jury to the oath they have taken, and admonish them against going outside of the record in the trial of any case; and then certainly, on a disregard of such admonition, there would be full authority to visit such punishment as would put an end to the practice. The judgment is reversed, and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.