Jim Wilson, alias Garner, v. The State.

No. 1456. Decided June 1, 1898.

**1. Murder—Corpus Delicti—Identity of Deceased—Circumstantial Evidence.**

See facts stated in the opinion which, though the evidence is circumstantial, are held by the court sufficient, in connection with the confessions of defendant, to establish the identity of the deceased, and that he came to his death by violence at the hands of the defendant.

**2. Misconduct of Jury—Discussing Defendant's Failure to Testify.**

Our statute, Code of Criminal Procedure, article 770, inhibiting a discussion or allusion to defendant's failure to testify, applies with peculiar force to the jury while they are considering their verdict. Where the law has been violated in this regard by the jury before they have agreed upon a verdict and the punishment to be assessed by them, this alone will require a reversal without any estimate of the question of injury to the defendant.

**3. Same—Remarks of Judge.**

On an investigation as to the misconduct of the jury in regard to their discussing defendant's failure to testify, a remark by the court, that "what he wanted to know was, what was said by the jurors, because, if he was compelled to fine any members

of the jury for such misconduct, he wanted to be sure they said it before he fined them;" Held, of a character to constrain the jurors in giving their testimony, and was not calculated to procure a full, free, and fair investigation.

APPEAL from the District Court of Bell. Tried below before Hon. JOHN M. FURMAN.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant, Jim Wilson, alias G. H. Garner, with the murder of J. L. Campbell, in Bell County, on the 4th of September, 1896, by shooting him with a gun.

Wiley Allgood testified that in August, 1896, he (Allgood) was picking cotton for Dempsy Pace, who lives about three miles northeast of Temple, and that appellant came to Pace's house on Thursday night, and on the Sunday following they went to Temple, and appellant left the next Monday morning and did not say where he was going. "But the next time I saw him was on Saturday night, September 5, 1896, after that Monday morning, at Alf. Pace's. I then noticed Jim had a watch; he did not have it when I last saw him; he told me he traded a horse, saddle, and bridle for the watch and chain and got some money to boot, but did not tell me where he made the trade." On the following Sunday morning witness and appellant went to Temple, where witness rented two bicycles from Russell & Hubbard. From Temple they went to Dempsy Pace's, Allgood wearing the watch. They returned the wheels the same evening, but rented them again for the purpose of going to Rockdale, in which direction they started that afternoon, but instead of going to Rockdale, returned to Alf. Pace's, two and a half miles northeast of Temple, where they ate supper, after which they started to Durango. They got about one-half of a mile, and on account of the darkness they decided to go back, and in doing so they went across a field, in which field they sat down to have a conversation, when, according to Allgood's story, he said to appellant: "Jim, where did you get that watch? Now, I want to know." To which defendant replied: "I will tell if you will never say anything about it." "I told him I would not tell, and he told me he killed a man for it. He said he killed the man up this side of Eddy; that he got with the man at Waco; that they got on the train at Waco and rode down to Bruceville, the first station above Eddy; that after they came down south of Eddy he said to the man, 'Let's go over yonder and get some grapes;' that after they got there the man was sitting with his head bent over with a knife in his hand whittling; that appellant was standing in front of the man with the watch in his hands trying to buy it on a credit; that the man had his head turned toward the appellant, and he just reached back and got his pistol and shot the man, etc. And this was on the 5th day of September, and he told me about it on the 6th day of September, 1896. He said he shot the man on Saturday morning, the Saturday morning before he got to my brother-in-law's, and then he told me about it on Sunday night. He said that after he shot the

man he got on the railroad and came to Alf. Pace's. He said he had sold the saddle in Lott for $2.50, and hot-dropped the horse and turned him loose. After he did that he went to Waco on the Aransas Pass. From the field where the conversation occurred we went to Alf. Pace's, where we spent the night, and from Alf. Pace's, next morning, started to Waco. He showed me the three hulls that killed the man, and said to me, 'Wiley, I am going to keep these always; they killed a man.' Next morning, Monday, on the way to Waco, as we were going down a steep hill, he just pointed out and said, 'It took place right over yonder.' I noticed some buzzards flying around over there in the direction of the railroad, down the branch."

The other evidence in the case was entirely circumstantial, and a resume of the important features of the same will be found in the first portion of the opinion below. All the matters pertaining to the misconduct of the jury will be found sufficiently stated also in the opinion.

*B. W. Scarbrough, Harris & Saunders,* and *Pearce & Felts,* for appellant.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and he prosecutes this appeal:

Aside from the confessions of appellant made to Wiley Allgood, and to which he testified, the case was one wholly of circumstantial evidence. The evidence for the State tends to show that deceased, whom we think was sufficiently identified as J. L. Campbell, was killed shortly after noon on the 5th of September, about two miles south of Eddy, on the west side of the railroad track, in a wood or thicket near a branch. His body was not found until the 15th of September, at which time it was in a badly decomposed condition. Among other circumstances identifying him as being J. L. Campbell was the fact that there was found on him a comb, sponge, and a piece of soap, the latter being used to wash or dress his sore leg. When the deceased was found it was shown that he had a sore leg. There was also found in his hat an express receipt, which was in the name of J. L. Campbell. In general appearance he was shown to resemble his brother, who was present at the trial. As a circumstance identifying him, it was also shown that deceased owned a gold watch before he was missing, and the next day after his disappearance the watch was traced to the possession of the appellant. When the body was found it was shown that the skull was pierced with what resembled a bullet hole. A hole also corresponding with that in the skull was found in the hat, cutting through the hat and also through said express receipt. A hole also resembling a bullet hole was found, having entered the back, and gone through the deceased. Coagulated blood was found under-

neath his head and stomach, on the ground where his body was lying. These circumstances, with others, in connection with the confession of the appellant, in our opinion, fully identified the deceased as J. L. Campbell, and that he came to his death by violence at the hands of defendant.

The only question necessary to be considered in this case is the alleged misconduct of the jury while they were considering their verdict. As one of the grounds of appellant's motion for a new trial, he alleges that after the retirement of the jury, and while in their jury room, before they reached their verdict, the matter of appellant's failure to testify was mentioned and discussed by the jurors. A number of the jurors were summoned, and this question appears to have been tried on the testimony of the members of the jury. It appears from the testimony of these jurors that, before the matter of the failure of the appellant to testify was mentioned, they had voted that appellant was guilty; and, while there seems to be an effort on the part of some to state that they had agreed on the degree of the offense, we fail to find that any member of the jury states that fact distinctly. It is shown that, while the case was submitted to them the evening or night before, they did not begin considering their verdict until the next morning, and that they did not in fact render their verdict until some time about the middle of the afternoon. We believe all of the jurors stated, with perhaps two exceptions, that they did not consider appellant's failure to testify as a circumstance against him; that they decided the case solely on the testimony that was developed on the trial. They all agree in stating that this matter of appellant's failure to testify was mentioned in the morning about 10 or 11 o'clock; and we gather from a number of these juror witnesses that, while they had voted defendant guilty of the homicide before the matter of his failure to testify was mentioned, yet they had not agreed on the degree of the offense, nor on the amount of punishment. One juror says that in the discussion of the matter some one remarked that the failure of the defendant to testify was an exception; that they usually put defendants on the stand. Boren, one of the jurors, states that, when they voted on murder in the first degree in the morning, he failed to vote, as he was undecided. Whitlow testified that the jury voted defendant guilty early in the morning; that just before going to dinner the fact of the defendant not testifying was referred to, and this was after the jury had agreed on the verdict and the penalty. He testified that appellant's failure to testify may have been mentioned before this, but he did not hear of it. Cantrell states that the jury had not agreed on the punishment when this matter was referred to; that they finally agreed on the verdict some time in the afternoon; that he thinks it was Walton and Whitlow who did not come over until after dinner. Soon after the jury came back from dinner these gentlemen came over. This juror testified that, when the matter of the defendant's failure to testify was first mentioned, some one remarked that they did not see why the defendant did not take the stand. He stated that the first vote was as to whether or not defendant was guilty, and was not on the degree of the crime or on

the penalty, and it was before the jury had found the degree or assessed the punishment that the defendant's failure to testify was mentioned; that, soon after voting that defendant was guilty, some of the jury wanted to read the charge to see whether it was murder in the first or second degree. At the first vote all but three voted for murder in the first degree and a life sentence. The other three refused to vote at all, and it was not until after dinner that these three voted for the verdict the jury brought in. These three said they wanted to read the charge carefully to understand the difference between murder in the first degree and murder in the second degree. McClure, another juror, stated that the matter of the appellant's failure to testify was mentioned in the jury room before the jury rendered a verdict. The jury had voted him guilty, but had not assessed the punishment. Three of the jurors said they had not studied about it long enough, were not ready to vote, and did not vote at first. After dinner the whole jury voted, and wrote out the verdict. These three did not vote with the balance in the forenoon, but did vote in the afternoon. Walton and several others wondered why the defendant did not testify. Madden stated that they agreed on a verdict after dinner; that in the forenoon some of the jury mentioned the defendant's failure to testify. Walton said he did not see why they did not put the defendant on the stand; that it was always customary. Some of the jurors said they wished that defendant had taken the stand. Thurmond, another juror, stated that the jury had all got together on the crime before dinner, but they waited until after dinner to vote on the punishment; that he thinks he heard Walton say that he wondered why the defendant did not testify. This is the only juror who states that he could not say positively whether or not the fact of the defendant's failure to testify had any weight with him; that he knew under the law, the defendant had a right to testify in his own behalf; and that he considered the defendant's failure to testify to that extent, and to that extent it might have been a point against him. Bangle stated that some of the jury wondered why defendant did not take the stand, and that they spoke of it three or four times; that he made up his verdict from the evidence given on the witness stand; that the jury found the defendant guilty of killing Campbell for his watch, and, under the charge of the court, that was murder in the first degree. Some said they would not render a verdict in a hurry in such a serious case; that he did not know what was holding the others back from rendering a verdict; that the jury voted on his guilt in the morning, and rendered the verdict in the afternoon. Other jurors testified similarly to the last.

As stated above, we think it is evident that the jury had not agreed on the degree or on the offense when this matter of appellant's failure to testify was first mentioned and brought to the attention of the jury. The matter seems to have been brought up several times, and must have been for some purpose—either to assist the jury in solving some question, or to bring some recalcitrant jurors to agree to the verdict; and while all

39th Crim. Rep.—24

of the jurors, except one, state that this matter did not influence them in the least, yet, viewing the question as presented in this record, we are unable to say that it did not influence some of the jurors. We would not be understood as holding that misconduct of this character should be shown to go to that extent. The statute appears to be mandatory against its discussion before the jury, and it appears to us, by equally as good a reason, the jury should be inhibited from a discussion of the defendant's failure to testify. In this particular case it appears that the jury, in delivering their testimony on this srbject, were more or less constrained by the admonition given them by the court early in the investigation. A bill of exceptions shows that appellant objected to the remarks of the court when the juror Sumrall was being examined. This juror started to tell his opinion as to what was meant by something that some of the jurors said in reference to the defendant's failure to take the stand and testify. Thereupon the court stated that he did not care to have the opinion of the witness as to what the juror meant. What he wanted to know was what was said by the jurors, because, if he was compelled to fine any member of the jury for misconduct, for something said improperly in the jury room, he wanted to be sure they said it before he fined them. This remark, in the presence of the jury, was of a character calculated to constrain them in giving in their testimony; that is, they were made aware by the court that, if it was evident that they had discussed this matter in a way to influence their verdict, they were liable to be fined. This was the sword of Damocles, held over the jury, which was not calculated to procure a full, free, and fair investigation. We do not understand that this was an investigation for the purpose of ascertaining whether or not the jurors should be fined by the court, but was for the purpose of ascertaining whether or not a new trial should be granted. Of course, if, in the investigation, the court ascertained that the jury had been guilty of misconduct, it was his duty to punish them therefor, but it was not necessary to mention this when the investigation was being conducted for another purpose. It is not necessary to discuss this matter under the statute, as the question underwent a thorough investigation in Tate v. State, 38 Texas Criminal Reports, 261, and we there laid down the rule. We quote from that opinion as follows: "Our statute provides (Code Criminal Procedure, article 770): 'Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented upon by counsel in the cause,' etc. Now, we take it that a proper construction of this statute has reference to every part of the trial, and especially are the jury inhibited from considering the defendant's failure to testify as a circumstance against him, because they constitute the triors in every criminal case, and the language of the statute would appear to be directly aimed at them. We are left in the dark as to the extent of the discussion of this matter in the jury room, nor are we informed that it had any par-

ticular effect as against the defendant; but we are constrained to believe that, as the matter appears from the record in this case, it must have been used to his detriment. As stated above, the statute is plain in its terms, and it does not stop to estimate the question of injury. It inhibits the failure of the defendant to testify from being used as a circumstance against him, and this court has often reversed cases where this matter was discussed by counsel for the State before the jury. In our opinion, the same rule would apply where the matter was discussed by the jury after their retirement."

In our opinion, the evidence before us makes this a stronger case of misconduct on the part of the jury than Tate's Case, supra, and the court should have promptly granted a new trial to the appellant on this ground. Of course, we take it that the learned judge trying the cause was aware of the decision in the Tate Case, and a new trial then granted would have saved the delay and expense attendant on an appeal. Moreover, another trial could have been promptly had, and all the witnesses in attendance on the court secured. (This is in reply to the argument of the district attorney, representing the State, that some of the witnesses had left the State, and that their testimony could not now be had.) The judgment is accordingly reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.