THE STATE OF KANSAS v. ROBERT HAWTHORN BURTON.

No. 13,134.   (70 Pac. 640.)

SYLLABUS BY THE COURT.

1. JURY AND JURORS—*Misconduct*. When a juror in a capital case makes a statement to his fellow members about material matters outside the evidence, and of a prejudicial character, based on his personal knowledge, it will vitiate the verdict, unless a clear showing be made that the defendant suffered no prejudice from the misconduct.

2. ———— *When it is the Duty of Court to Keep Jurors Together.* While the law allows a separation of the jury, with the permission and under proper admonition of the court, until a final submission of the case, yet, if it appears that enemies or friends of the accused will endeavor to influence the jury, or that jurors, in commingling with the public during the trial, will be exposed to im-

proper extraneous influences, or be affected by the passions or prejudices existing outside the court-room, it is within the province and duty of the court to keep the jury together during the trial, under the restraining supervision of an officer.

Appeal from Marion district court; O. L. Moore, judge. Opinion filed November 8, 1902. Reversed.

.A. A. Godard, attorney-general, and R. L. King, for The State.

Keller & Dean, for appellant.

The opinion of the court was delivered by

Johnston, J. : Robert Hawthorn Burton was informed against, tried, and convicted of murder in the district court of Marion county. On a former trial he was convicted of murder in the first degree, but on appeal the judgment of conviction was set aside for errors committed, and a new trial was awarded. (The State v. Burton, 63 Kan. 602, 66 Pac. 633.) The principal facts of the homicide are related in the report of the former appeal, and a restatement of them here is not necessary.

On this appeal the main and controlling considerations assigned for reversal arise upon the irregular actions of the jurors, and of those near to and in control of them. In behalf of the defendant, it is said that unusual interest was taken by the people of the community in the trial and its result, and especially in the second trial, and that, to avoid any improper influences on the jury from commingling with the people who had decided opinions in regard to the killing of Hoffman, or who had especial interest in securing the conviction of the defendant, counsel requested the court to have the jury kept together under charge of a sworn officer during the trial, but the request

was refused. In our state the law allows a separation of the jury, with the permission and under proper admonition of the court, until a final submission of the case. There are cases where the court in its discretion may well order the jury to be kept together, and away from the excitement and prejudices of the community, from the beginning of the trial. If there is danger that the enemies or friends of the accused will endeavor to reach and influence the jury, or that the jurors, in commingling with the public during the trial, will be exposed to improper extraneous influences or be affected by the passions and prejudices existing outside the court-room, it is the duty of the court to keep the jury together under the restraining supervision of an officer and beyond the reach of the outside parties and influences. Believing that such dangers existed in this case, the defendant requested that the jury be kept together during the trial under the care of a bailiff duly sworn.

It is charged, and the testimony offered on the motion for a new trial showed, that three brothers of the deceased, Hoffman, who attended the trial, as well as certain witnesses for the state, took occasion to mingle with, and make themselves agreeable to, the jury at every recess and adjournment of the court, and that when friends or attorneys of the defendant approached them the conversations with the jurors would cease, so that it was difficult to learn what they were saying, but they appeared to be holding private and confidential conversations with the jurors. One of the strange things in the case was the fact that William Hoffman, one of the brothers of the deceased, who had come from Colorado to attend the trial, although not a witness, roomed and slept a night with one of the jurors after the trial commenced. The juror had

been assigned to another room, but for some reason was changed to the room occupied by Hoffman. They had conversation together, but the juror stated that the facts of the case were not discussed, and he further stated that he was not aware that his roommate was a brother of the man who was killed by Burton. There was proof to show that William Hoffman offered to treat two of the jurors to drinks of malt ale at his expense, but they declined the offer. During the deliberations of the jury, the sheriff and a deputy of his, neither of whom was sworn as bailiff in the case, entered the jury-room and held some conversation with the jurors, although nothing was said of the pending case. The occasion for their going was that the court had directed the sheriff to furnish supper for the jury to the bailiff. Instead of allowing the bailiff to take the food to the jury, they carried it into the jury-room, and one of them states that the jurors "jollied" them about the supper that was furnished. Misconduct of a more serious character occurred during the deliberations of the jury.

The crucial point in the case was whether there was a necessity, or an apparent necessity, for the shooting of Hoffman. It was claimed by the defendant that Hoffman was a violent and desperate man, who had threatened the life of the defendant. One of the jurors stated to his fellows that he knew that Hoffman was nothing but a bluffer, and that he would not have hurt anybody. A similar statement appears to have been made by another of the jurors, and these were not based upon the testimony in the case, but rested upon personal knowledge. Another juror stated in the jury-room that a former jury had found the defendant guilty of murder in the first degree, and there was no reason why a different verdict should be ren-

dered now. There was further testimony that a juror stated to his fellows that everybody in Marion believed the defendant to be guilty of murder in the first degree. Several of the jurors testified positively that these extraneous and prejudicial statements were made. It is true that a greater number of the jurors testified that they did not make them, or hear them made, but they coupled with it the further statement that such statements might have been made in the jury-room, but, if so, they did not think they were based on the personal knowledge of the jurors.

We think the state wholly failed to meet the positive testimony that the prejudicial statements of an evidentiary nature were made, and in such case the burden rests on the state to prove that the defendant suffered no prejudice from misconduct and improper influences. It is true the jurors testified that they were not affected by the statements and extraneous influences, but that kind of testimony is hardly sufficient in a case involving the liberty of a prisoner for life. Jurors will generally hold the opinion, and honestly too, that they are not prejudiced by improper influences; but who can say that these statements, based on the personal knowledge of their associates, did not unconsciously influence their judgment and action? Who can say that they were not affected by the information wrongfully introduced in the jury-room that another jury had at another time found the defendant guilty of the highest degree of the crime with which he was charged? Nor is it easy to show that the defendant suffered no prejudice from the testimony from the outside that the public of Marion county believed he was guilty of murder in the first degree.

It is the aim of the law to surround a trial by such

safeguards as will exclude all external and improper influences from the jury, and thus protect the rights of the defendant and prevent the conviction of the innocent. It has been said by this court:

"We cannot be too strict in guarding trials by jury from improper influences, and in compelling a rigid and vigilant observance of all the provisions of the statutes tending to preserve the purity of such trials. The verdict, when returned into court, must command entire confidence. It must be secure from all improper bias, and even from the suspicion of improper bias." (*The State v. Snyder*, 20 Kan. 306, 310.)

When jurors, in their zeal to secure a finding of guilty against the accused, bring before their fellows material statements and facts based on personal knowledge, which were not given in evidence, confidence in their verdict is necessarily shaken. If such matters had been admitted in evidence in court, where the defendant had opportunity to meet and disprove them, it would have been material error; and where they are introduced before the jury when the defendant is absent, and without opportunity to challenge or meet them, they are still more hurtful and erroneous. In the nature of things, these extraneous statements were very prejudicial, and, as they were not shown to be without prejudice to the defendant, they necessarily vitiate the verdict and require a new trial. (*A. T. & S. F. Rld. Co. v. Bayes*, 42 Kan. 609, 22 Pac. 741; *The State v. Woods*, 49 id. 237, 30 Pac. 520; *The State v. McCormick*, 57 id. 440, 46 Pac. 777, 57 Am. St. Rep. 341.) This error, although sufficient of itself to accomplish a reversal, is somewhat emphasized by other irregularities and misconduct which have been mentioned. Some of them were manifestly without prejudice, while, as to others, it is not so easy to say that the jury were free from impartial influ-

ences, or that the defendant suffered no prejudice from them.

While we are reluctant to set aside a second conviction, we cannot sanction a verdict in a capital case surrounded with so many opportunities for improper influences, and where extraneous and prejudicial facts and statements were put before the jury while they were determining the rights of the defendant to life and liberty.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

SMITH, CUNNINGHAM, GREENE, BURCH, JJ., concurring.

DOSTER, C. J. (concurring): While I concur in the judgment of reversal in this case, I only do so as to the first ground, namely, prejudicial statements by jurors to their fellows in the jury-room, for the reason that the evidence, in court, of the jurors as to the making of such statements in the jury-room was admitted without objection. To my mind, the practice of allowing jurors to expose the secrets of the jury-room, and relate matters occurring there which may have influenced their verdict, while sanctioned in such cases as this by former decisions, is radically wrong. It is allowing jurors to impeach their verdict as to matters inhering in it, and it should not be permitted. Mr. Justice POLLOCK agrees with me.