## MRS. SALLIE BOOZER v. THE STATE.

### No. 4598. Decided October 31, 1917.

**1.—Murder—Evidence—Expert Testimony—Circumstantial Evidence.**

Where, upon trial of murder, the State sought to prove that a certain ax was used. in committing the homicide and dependent upon the surrounding circumstances including the wounds inflicted, it was reversible error to reject testimony of a physician who had examined the character of the wound and also the ax in question; that under the circumstances the ax would not have been the instrument with which the wounds on the deceased had been inflicted. Following Betts v. State, 60 Texas Crim. Rep., 631, and other cases.

**2.—Same—Misconduct of Jury—Allusion to Defendant's Failure to Testify.**

Where the motion for new trial alleged misconduct of the jury in alluding to defendant's failure to testify, and it appeared from the record that such comment was made by some of the jurors in considering their verdict and before the same was rendered, and that such an allusion evidently made an impression or tended to do the same, a new trial should have been granted.

Appeal from the District Court of Nacogdoches. Tried below before the Hon. L. D. Guinn.

Appeal from a conviction of murder; penalty, six years confinement in the penitentiary.

The opinion states the case.

*Beeman Strong* and *C. C. Watson,* for appellant.—On question of misconduct of jury: Walling v. State, 59 Texas Crim. Rep., 279; Buessing v. State, 63 S. W. Rep., 318; Fine v. State, 77 id., 806; Wilson v. State, 39 Texas Crim. Rep., 365; Tate v. State, 38 id., 261.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of expert testimony: Waite v. State, 13 Texas Crim. Rep., 169; Lovelady, 14 id., 545.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder, her punishment being assessed at six years confinement in the penitentiary.

This is a case purely of circumstantial evidence. . Briefly stated, the facts disclose that deceased and appellant, his wife, lived in their home with two children, a boy and girl about grown. Within about three hundred yards of them lived a family named Forsythe. There was a play at a little church or schoolhouse in the neighborhood a mile or two away on the night of the death of deceased, and the two children of deceased and appellant were attending that play. This would leave deceased and appellant together at home. Somewhere about 10 o'clock screaming was heard at the home of deceased. Young Buford Forsythe and his mother went to the home of appellant, found her at the barn with a rope around her neck tied to a plank above her head, presenting an appearance of hanging. An explanation of conditions was given by her to these parties, who testified on the trial. The statement, substantially, is that while she and her husband were in a room in their residence some man entered, placed a pistol in front of her, and took her away down to the barn and hung her; that she lost consciousness between the time she left the house and the time she began screaming. She apparently did not know that her husband was killed. These witnesses carried appellant to the Forsythe residence and placed her on a bed. Different neighbors were called and officers from the town of Nacogdoches, four miles away, and Mr. Forsythe and another witness took a lamp, went to the residence of deceased and found him on a pallet on the floor dead and very bloody about the head. It seems they made no examination, but later other parties came and upon examination found he had been struck a very heavy blow on the side of the head, crushing the skull. This wound . was described to be about an inch and a half or two inches long, and something like an inch or an inch and a quarter in width. The cutting into the flesh presented a smooth cut wound. The evidence showed that this blow killed him, and being delivered with great force, death resulted practically instantaneously. There was an ax found near the wood pile in a stump which belonged to the family. This old stump seemed to be the usual receptacle for this ax when not in use. When young Buford Forsythe and his mother were passing the house where this tragedy occurred en route to the barn, young Forsythe caught his mother by the arm and jerked her to one side and into the road, remarking that he heard someone in the house. This he testifies, as does his mother, and he further testifies he did hear a noise in the house as if someone was walking or turning over a chair. These people had lived there something like fifteen or twenty years; there was nothing noticeable about their conduct one way or the other; they were ordinarily good people, and if there were any differences between husband and wife they were evidently trivial. There was no motive

shown on the part of the wife to kill her husband, and the only motive the writer gathers from this record for anyone to kill him was the fact that it was understood he kept money about the premises. Appellant was a small woman, and had been sick a great deal, and weighed probably less than one hundred pounds. About six years prior to the homicide there had been one or more operations performed on her, one for appendicitis and the other to remove her ovaries. About six years prior to the homicide one of her children, a son, had died, and the appellant showed after that she was a changed woman in many respects, and suffered often with what the witnesses called "spells." The doctor who attended her says they would last from two days to two weeks. The symptoms were all described, but it is unnecessary to repeat them. She was under treatment of the doctor almost continually for six years prior to this homicide, he testifying that he saw her practically every week. Without going into any further details about the matter, this is a sufficient statement.

A bill of exceptions recites that Dr. Barham was a regular graduated physician of fifteen years experience, and that he was called for that purpose and did examine the wounds upon deceased, that he made a thorough and extensive examination, and found only one wound upon the body, which was on the left side of the head in the left temple; that the wound was made with a blunt instrument, breaking the skull in such way that he could determine the size of the instrument, and that the skull was cut smooth around the edges of the indenture showing that the edges of the instrument inflicting the wound were smooth. He further testified that he saw and carefully examined on the next morning after the homicide in the justice of the peace office at Nacogdoches an ax which was found at the wood pile at the home of deceased on the night of the homicide, which ax was introduced in evidence as the supposed instrument with which the homicide was committed, and offered testimony also that there was blood on the ax. Dr. Barham further testified that he examined the ax on the morning after the homicide, and some few hours after he had examined the wounds on deceased's body, for the purpose of determining whether said ax was the instrument used to inflict the wound. He also testified that the ax which was handed to him while he was on the stand, offered in evidence by the State, was the same ax that he examined on the morning after the homicide in the justice of the peace office; and further, that by reason of his examination of the wound and of the ax he was in position to state whether or not said ax inflicted the wound on deceased's head, and further testified that as a physician he had a great deal of experience in the examination of wounds of various kinds and characters and of instruments with which they were inflicted; and after the witness had testified as above set out, appellant then proposed to prove as follows: "That the ax which was handed to him while on the witness stand (and which was the ax offered in evidence by the

State upon the trial as the instrument with which the murder was committed, and upon which the State offered evidence to show that there was blood, and being the same ax found at the wood pile of the home of deceased and defendant and examined by said witness Barham in the justice of the peace office on the morning after the homicide) could not have inflicted the wound which he, said witness, examined upon the head of deceased (and being the only wound found by said witness on deceased's body), for the reason that the poll of said ax was too broad and too long to have made the indenture which was above seven-eighths of an inch in depth in the skull of deceased, and that the poll of the ax was rough around the edges, and for that reason could not have inflicted the wound found by him on deceased's head, and for the reason that the edges of said wound were perfectly smooth and could not have been left in said condition by anything other than a smooth instrument around the edges; that from his examination of said wound and his examination of said ax immediately after the homicide and also while on the stand as a witness in this trial, all of which examinations were careful and thorough, and that said ax (which the State offered in evidence as the instrument which inflicted the wound on deceased), could not have inflicted the wound, and that said wound could not have been inflicted by said ax under any circumstances."

The purpose of introducing this is thus stated, that the State has offered in evidence the ax examined by the witness Dr. George S. Barham, in the justice of the peace office a few hours after the homicide, and also examined by said witness upon the trial while on the witness stand, and the State had offered evidence that said ax was found at the wood pile near the scene of the homicide, and that there was blood on same when it was found a few hours after the homicide, and had offered evidence tending to show that said ax belonged to the family of defendant, and the State contended that the said ax was the instrument used to commit the murder, and that defendant knowing where said ax was kept and the surroundings, was the guilty party, and the State made the contention in the trial that had any other party committed the offense, he would have likely brought some instrument with him with which to commit the offense, and that it was very improbable that any other party than defendant would have used the ax which belonged to the Boozer home, and the State contended that the ax offered by them in evidence was a strong link in the chain of circumstances which the State relied on to convict the defendant, and had said witness, Dr. Barham, who was wholly disinterested, been permitted to testify that he made a thorough examination of both the wound on deceased and the ax, and that in his judgment it was a matter of impossibility for said ax to have inflicted said wound, said testimony would have greatly weakened the State's case, and would have tended strongly to show that the defendant was innocent.

Various objections were urged to this by the State, which objections were sustained and the testimony excluded. The judge states that this

bill is signed with the qualification that the statement of facts is referred to, and further that the witness could give a description of the wounds and ax and let the jury pass on the matter. We are inclined to the opinion that this testimony was admissible under the circumstances stated. See Betts v. State, 60 Texas Crim. Rep., 631; Waite v. State, 13 Texas Crim. App., 169; Banks v. State, 13 Texas Crim. App., 182; Kirk v. State, 35 Texas Crim. Rep., 224, 37 S. W. Rep., 440. It seems to be practically the well settled rule that experts may be permitted to testify that certain instruments may or could have inflicted wounds when those wounds were the subject of investigation. The wound may have been inflicted by this ax, and as the State was seeking to prove this and relying upon it, the reverse of the proposition ought to be that defendant could prove that it was not and could not have been done by the ax. This was described by the witness as being an ordinary poll ax, and the wound was described as being much smaller than the length of the poll of the ax and of smooth appearance. It seems from this testimony also that the poll of this particular ax was ragged and jagged on the edges. We are of opinion that under these circumstances this testimony should have gone to the jury to be weighed by them. The State's whole case seems to have revolved around and depended upon the fact that deceased was killed by the use of this ax. There was also in this connection a serious contention by the State that there was blood found upon the ax, and by the defendant that the substance seen upon the ax was not blood. We are of opinion that the doctor under this bill of exceptions should have been permitted to testify to these facts.

There is another bill of exceptions reserved to the action of the court overruling certain matters set out in the motion for new trial, among others, misconduct of the jury in referring to the failure of appellant to testify during the trial. We are of opinion that this contention should have been sustained. See Mizzell v. State, 197 S. W. Rep., 300, and cases cited in that opinion; Walling v. State, 59 Texas Crim. Rep., 279; Fine v. State, 45 Texas Crim. Rep., 290, 77 S. W. Rep., 806; Buessing v. State, 43 Texas Crim. Rep., 85, 63 S. W. Rep., 318; Wilson v. State, 39 Texas Crim. Rep., 365; Tate v. State 38 Texas Crim. Rep., 261.

The facts in this connection show by the juror Stallings that he was a member of the jury, and that the jury retired about 3:30 o'clock in the evening to consider their verdict. As to whether or not the failure of defendant to testify was referred to, he said: "I never heard it mentioned in connection with the deliberation of the jury, that is, in connection with the verdict; the only time I heard it mentioned was last night, but last night I heard someone make the assertion that if they were being tried for killing their wife they would have taken the stand in their own defense"; that is, if they were charged with or being tried for killing their wife they would take the stand in their

defense. This was at night after their retirement in the evening about 3:30 o'clock before returning the verdict the following morning about 9 or 9:30 o'clock. He says: "I don't remember just how many mentioned this—just how many times I heard it—but possibly just the one time, just by the one man, and I don't know who that was now. I don't know that I heard but one person say that if they were being tried charged with killing his wife he would take the stand in his defense, but probably someone else commented on it." He further says that after the jury retired they took what he called a secret ballot, and that resulted in a unanimous vote of guilty. This reference to the failure of defendant to testify occurred after that but before the verdict was reached. It was also mentioned, he says, in this connection, that when the remark was made someone said, "We could not consider that because the court charged us not to do so." When they took the first ballot as to the penalty nine men stood for five years, and the other three men were for above five years. He also testified that this did not influence his verdict. One, at least, of the jurors was for twenty-five years. Grigsby, another juror, testified in reference to their secret ballot of guilt, and that they stood 9 to 3, nine in favor of five years and the others above five years. Then he says: "While I was in the jury room I heard someone make the remark that if they had been charged with killing his wife he believed that he would go on the stand and testify in his own behalf, or something like that. I don't remember who it was that made this remark; don't know whether I knew who it was at the time or not, but we didn't have any discussion about that." He says someone spoke up and said, "We must not consider that." He did not recall who it was made the remark. There was no one else in the jury room except the twelve jurors. Wallace, another juror, testified that someone made the remark that if they were charged with killing their wife he would have gotten on the stand, or that they could not have kept him off of the stand, or something like that; "one of the jurors made that remark, and someone just replied that we could not bring her in that way; that we couldn't talk on that subject, about her evidence or anything that way; that we couldn't talk about that." These three jurors seemed to have been for a verdict of five years. The verdict returned was for six years.

Under the cases cited this was such an allusion to and comment on the failure of the defendant to testify as to require a reversal of this judgment. That it entered into a consideration by the jury could hardly be questioned. These references to the fact that appellant did not testify served to emphasize the manner in which those who made the statement considered her failure to testify. This carries with it the fact that the jurors making such remark had in their mind the idea that appellant was derelict in not taking the stand under the circumstances and testifying, and it evidently made such an impression as caused the use of such language. Only three jurors testified; the remaining nine were present but were not used. The district attorney

wanted the record to show their presence; it does so show, but they were not placed upon the stand. The testimony was not questioned. This constituted the evidence in regard to the matter before the court.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*