## WATSON NED v. STATE.

No. A-4859. Opinion Filed Dec. 26, 1924.
(231 Pac. 550.)

(Syllabus.) .

1. Trial—Verdict to be Found on Evidence Produced at Trial in Open Court in Presence of Accused. In a criminal prosecution the verdict of the jury must be found upon evidence produced at the trial in open court, in the presence of the defendant.

2. Same—Juror not to Consider Facts Within His Knowledge not in Evidence. A juror, having knowledge of facts not in evidence, has no right to consider them in reaching a verdict.

3. Same—Conviction on Verdict Reached on Statements of Juror as of Personal Knowledge Set Aside. A verdict of conviction will be set aside, where during the deliberations of the jury a juror makes statements to his fellows as of his personal knowledge concerning material issues in the case, and which influenced the jury in arriving at their verdict.

4.    Same—Search by Bailiff at Instance of Juror, to Determine
Whether Accused Armed, and Report by Bailiff Held Miscon-
duct on Part of Both.    On a trial for murder, where it was
made to appear, on motion for new trial, that the bailiff, act-
ing on the request of a juror, searched the defendant to see if
he was carrying a pistol, then    reported to the jury that he
made the search and found him unarmed, held, misconduct on
the part of the juror and the bailiff.

Appeal from District Court, Marshall    County; Porter
Newman, Judge.

Watson Ned was convicted of manslaughter in the first
degree,. and he appeals.    Reversed, and new trial granted.

Minter & McClendon, Ratliff & Ratliff, Marion Shelling,
and Don Welch, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore and G. B.
Fulton, Asst. Attys. Gen., for the State.

DOYLE, J.    Plaintiff in error, Watson Ned, was charged
by information with the murder of Will Ritter. Upon the trial
the jury found him guilty of manslaughter in the first degree,
and assessed his punishment at imprisonment in the peniten-
tiary for the term of 99 years.    A motion to set aside the ver-
dict and for a new trial was duly filed, which was overruled,
and on the 29th day of May, 1923, judgment was rendered in
pursuance of the verdict.    To reverse the judgment this ap-
peal was taken by filing in this court on September 24, 1923,
a petition in error with case-made.

Among the assigned grounds for reversal are: The re-
ceiving of evidence out of court; misconduct of the jury in
having the defendant searched by the bailiff, and by causing
the result of the search to be communicated to them; miscon-
duct of the jury as shown on the hearing of the motion for a
new trial.

The Attorney General has filed a confession of error, which we adopt as the opinion of the court. It is as follows:

"The record discloses the following facts, to wit:

"At about 11 o'clock on the morning of December 9, 1920, Will Ritter and one of his relatives, Newt Ritter, who were collectors for the Singer Sewing Machine Company, went to the farm of Watson Ned, a full-blood Chickasaw Indian, who lived a few miles northwest of Madill, for the purpose of collecting $13, from plaintiff in error, which was due for a sewing machine plaintiff in error had bought.

"At the time the collectors drove into his farmyard the plaintiff in error was out in the yard boiling water in an iron pot, preparatory to scalding a hog, and had laid a butcher knife and a high-powered rifle near by.

"The collectors informed him of their mission to the effect that they had come to collect the remaining $13 on the sewing machine. Ned told them that he did not have the money at that time, but if they would wait until about sundown he would get it for them; that he was expecting a warrant from the county clerk; and that if they would wait until the mailman arrived that he would pay them off. The collectors told him that they had waited long enough to collect this money, and had been instructed to either collect the money or take the sewing machine; that the contract under which the sewing machine had been sold to Ned provided that in case payments were not made that the company or its agents had a right to take back the sewing machine. Ned told them that he did not think they had a right to go in his house and take the sewing machine, but that if they would wait upon him for a few hours he would get the money and pay them; but they refused to wait any longer, and said it was their intention to take the sewing machine at that time. Ned told them he would not permit them to take it off of his premises.

"This conversation lasted for about 45 or 50 minutes, most of which was a discussion as to the rights of the parties under the contract. The conversation became heated and in-

flammatory, and during the latter part the collectors took out their knives and began whittling on sticks. Ned becoming alarmed at this conduct, stepped over back of a small wood pile, picked up an ax, and began chopping wood. The collectors slowly walked around the wood pile toward him in a menacing manner, and making threatening statements. As a witness in his own behalf he testified as follows:

" 'Q. How long had you been actually talking about this; how long had they been there? A. Well, probably 40 or 50 minutes, something like that nearly; it seemed to me like that was the longest conversation over one thing that I ever heard from any man.

" 'Q. What else happened? A. Well, he says, "I came to get the machine; we are bound to have the machine or the money one." "Well," I said, "Well, you all go on because I ain't going to let you go into the house and get the machine at all, not at all." And the conversation was getting pretty high, and I was a little bit afraid, and wanted to get them off; I thought they had been there long enough too. I said, "Well, you go on, and I will go and get the horse, and I will be on after you and settle this thing." Just as I was saying that, I didn't want to stay there any longer. I turned this way. That is the first time I took my face from them two men there at the door.

" 'Talk louder.

" 'A. I say that was the first time I taken my face from their face, from the face of them men since we met at the door, and so I says, like that old man was there and the young man there, and I was standing out here, and as I says that I turned this way, and in turning I said, "You need not think of going in that house and getting the machine out," and just as I turned about like that, I was looking back, and the young—

" 'Q. Why did you walk back? A. I was afraid they would jump on me, and I had that little wood pile between

them; they had their knives, and I had the ax, therefore I thought I had protection there, and that is why I walked back to the fire.

" 'Q. How did you get to your gun? A. Well, I was— says to them, "If you will wait, I will go and get my horse," and in doing so I walked around and picked up a bucket of water, and put it on the fire, and put it out. They was sorta back here. I made the excuse— there was a bucket of water setting back there, and this gun, I will show you where it was, right there, right in here, so I making that excuse I walked out there thinking to make them think I was going to pick up the bucket of water when I got there; I walked and made a jump and went around and got the gun. Of course they was walking around on that side, and I walked around on this side, and we met at the east door.

" 'Q. What did you start to get your horse for? A. After I put out the fire, I aimed to come to town, provided if I didn't get that warrant in the mail that was coming that day.

" 'Q. Did you tell them that you were going to get your horse and come to town if it didn't come on the mail? A. Yes. Said, "God damn it, we will show you," just as I was looking back, I hadn't quite taken my eyes off both of them—not both of them, one of them there, and I seen him make a step with his right foot, with his foot that way, and of course all that was left to me was to shoot, and I shot when he done like that, and one went that way and the other one this way.'

"The plaintiff in error was tried and convicted for the murder of Newt Ritter and his punishment assessed at 7 years in the penitentiary, and was again tried in this case and convicted, and his punishment assessed at 99 years. The plaintiff in error herein filed a motion for a new trial, to which was attached two affidavits to the effect that the jury, during its deliberations, received evidence out of court, and the bias and prejudice of some of the jurors which resulted in an unfair trial.

"These two questions constitute the only assignment of error. The affidavits attached to the motion for a new trial were as follows:

"'I, C. A. Beane, being first duly sworn on oath, state:

"'I attended the trial of Watson Ned in the district court of Marshall county, Okla., which was held on the 8th, 9th, and 10th of May, 1923; I was in Madill on the night the jury was deliberating on their verdict in said case, and while sitting on the lawn in front of the county courthouse heard one of the jurors make the following statement: "I do not care what the charge says, or what those lawyers say, I know what is in that contract. I worked for a man who used that kind of a note, and that Indian knew that those men had a right to get that machine. Anybody knows that who can read. I can't read much, but I can read enough to know that, and I will tell you what the contract says. It says the dealer has a right to go into your house or anywhere else that you can find the stuff whether you agree to it or not, and you can get one of those contracts and read it, and if it don't say that I will agree to turn him loose." The same man also said that he knew all about a high-power rifle, and that they kicked worse than a shotgun, and, if that Indian had held that gun as he said, it would have jumped clear out of his hands. In reply to a suggestion that he should have about what he had been given in a former trial, the same man who had made the statements said, "Yes; and if we give him that he will appeal or be pardoned and come back here and kill half of us."

"'C. A. Beane.'

"'I, J. R. McClendon, being duly sworn on my oath, state: That I am one of the attorneys for the defendant in cause No. 496, wherein the state of Oklahoma is plaintiff and Watson Ned is defendant; that on the night of May 9, 1923, while sitting on the courthouse lawn, west of the courthouse, in conversation with Mr. C. A. Beane and another person, whose name I do not know, my attention was attracted to a discussion of the case, then on trial, by the jury, which was

then in the juryroom in the southwest corner of the county courthouse; while discussing this verdict, I heard one of the jurors say in substance that it did not matter what the charge of the court said, or what the attorneys said, that he knew something about those contracts, meaning "the contract on which Watson Ned purchased a machine from the Singer Sewing Machine Company"; that it had not been brought out in the testimony; that he knew that those contracts gave the Singer Sewing Machine Company the right to enter the defendant's premises or any one else's premises and take sewing machines whenever they could find them, no matter whether it had been sold or traded, or how the party got possession of it; that he had worked for a man who used the same kind of contracts, and that he had read them and knew what they contained; that anybody who could read could understand; that he couldn't read much, but that he could read enough to know that when he signed one of those contracts that he gave the company a right and thereby consented that they might come to his premises and take the machine whether he told them they might take it or not. Another juror suggested that he thought that he had a right to defend his home and his property, but that he did not believe that he had a right to kill those people, that he thought he should have about the same sentence as he had in the other case. In reply to this, the party who had made the statement with reference to the contract said, "If you are going to give him 5 or 10 years, he will appeal the case or be pardoned, and come right back here and kill half of us, and that before he would agree to give him that, he would turn him loose." The same juror also stated that the stuff he swore about the manner in which he held the gun was absolutely untrue; that he knew of his own knowledge all about a high-power rifle; that they kicked worse than a shotgun; that if the Indian had held the rifle as he said he did, that it would have jumped out of his arms, and that this fact would have been easy proven by Sneed if he had tried. Affiant further says that he was also informed by the bailiff who had charge of this jury, that the question of whether or not the defendant had a pistol was discussed at the McCoy restaurant, and that he told the jury

that he did not believe that he had a pistol; that he thought the thing he saw in his pocket was a bunch of papers, but that some of them insisted that he should be searched; that when they returned to the courthouse, he went to the defendant and told him that the jury thought he had a pistol; that he didn't think he had, but that he just wanted to see so that he might assure the jury; that he examined him and he did not have a pistol; that he went back to the jury and told them that they need not be uneasy; that what he had was only a bunch of papers.

" 'J. R. McClendon.'

"Under these two affidavits plaintiff in error in his brief argues that the evidence which the jury received out of court is of two kinds, first, evidence as to the kicking power of the gun used by the defendant; second, evidence as to the kind of contract deceased had with reference to their right to enter the home of the defendant over his objections. The contracts were not introduced in evidence, and on the motion for new trial the above affidavits were not rebutted by the county attorney."

"Section 20, art. 2, of the Constitution, provides that one of the constitutional rights of the defendant is 'to be confronted with the witnesses against him.' In the case of A., T. & S. F. Railway Co. v. Davis & Young, 26 Okla. 359, 109 P. 551, the rule was laid down: 'When it is reasonably within the power of a party to offer evidence upon the facts, and rebut the inferences which the circumstances tend to establish against him, and he fails to offer such proof to rebut same, the natural conclusion is that the proof, if produced, would support the inferences against him, and the jury is justified in acting upon that conclusion.'

"In the case of State v. Lowe, 67 Kan. 183, 72 P. 524, the Supreme Court of Kansas said: ' (1) A new trial for misconduct of the jury should be allowed where a juror of his own personal knowledge states to his associates, while deliberating on their verdict, facts prejudicial to the defendant which are not in the testimony, unless it is shown that the

defendant suffered no prejudice from the misconduct. (2) The defendant, who was charged with the larceny of property, and who claimed to have taken the same by mistake, may testify directly as to his intention in the taking of the property.'

"In the case of State v. Burton, 65 Kan. 704, 70 P. 640, another Kansas case, the court said: '(1) When a juror in a capital case makes a statement to his fellow members about material matters outside the evidence, and of a prejudicial character, based on his personal knowledge, it will vitiate the verdict, unless a clear showing is made that the defendant suffered no prejudice from the misconduct. (2) While the law allows a separation of the jury, with the permission and under proper admonition of the court, until a final submission of the case, if it appears that enemies or friends of the accused will endeavor to influence the jury, or that jurors, in commingling with the public during the trial, will be exposed to improper extraneous influences, or be affected by the passions or prejudices existing outside the courtroom, it is within the province and duty of the court to keep the jury together under the restraining supervision of an officer during the trial.'

"This ruling was also adhered to in the following cases:

"'The modern jury must arrive at their verdict from evidence regularly produced in the course of the trial proceedings, and so it is that the jurors cannot act on their personal knowledge in arriving at a verdict. Nor are they privileged to influence other jurors by making statements as of personal knowledge concerning material issues in the case. If such statements are made, and the jury thereby influenced, the verdict will be set aside. To this rule no exception can be admitted, either in civil or criminal cases. In criminal cases more emphatically there can be no exception because among the rights absolutely secured by the Constitution to the accused is the right to be confronted with the witnesses against him.' 16 Ruling Case Law, p. 304, citing State v. Gaymon, 44 S. C. 333, 22 S. E. 305, 31 L. R. A. 489, and note 51 Am. St. Rep. 861; People v. Dunn, 157 N. Y. 528, 52 N. E. 572, 43 L. R. A. 247; and the note in 134 Am. St. Rep. 1053 et seq.

" 'Defendant was charged, under section 31 of the crimes act, with carnally and unlawfully knowing a female under the age of 18 years. After the jury had retired to consider of their verdict, and had discussed the guilt and innocence of the defendant for about 15 minutes, two ballots were taken. Nine jurors voted for conviction, and three for acquittal. Then, while the jury were consulting in regard to the age of prosecutrix, one of the jurors stated to the other members of the jury that "three years ago she was a small girl, wearing short clothes, and that he saw her about three years ago at a baptism in short dresses," and other similar language, and thereupon one of the jurors who had voted for acquittal said: "If that's the case, we will vote for conviction." Then a ballot was taken, a conviction unanimously voted for by all the jury. Held, that a new trial should be granted.' State v. Woods, 49 Kan. 237, 30 P. 520.

" 'It is ground for new trial that one of the jurors, on a trial for false pretenses, stated as a fact, while the jury were deliberating that defendant had been convicted on a former trial, and also that he had defrauded a third person, whose evidence in that regard had been excluded.' State v. McCormick, 57 Kan. 440, 46 P. 777, 57 Am. St. Rep. 341.

" 'New trial for misconduct of jury should be allowed where a juror states of his own knowledge facts prejudicial to defendant which are not in evidence. State v. Lowe, 67 Kan. 183, 72 P. 524.

" 'Where one of the jurors stated in the presence of his fellows and during their deliberation that he knew that defendant had been selling beer, because he drank some of it himself, and that he knew that defendant had followed the liquor business for years, whereupon the jury, which had stood largely for acquittal, agreed to a conviction, a new trial should have been granted.' State v. Duncan, 70 Kan. 883, 78 P. 427.

" 'Where it was in issue whether the person who sold the liquor was an employee of defendant, it was ground for new trial that one of the jurors stated in the consultation

room as of personal knowledge that such person was in the employ of defendant.' State v. Beam, 1 Kan. App. 688, 42 P. 394.

" 'A juror, in a prosecution for grand larceny, swore that he did not know defendant, that he knew nothing of the case, and that he was without prejudice, but when the jury retired he stated that defendant was equally guilty with a codefendant who had confessed, because both were members of a certain tough gang. Held ground for a new trial.' State v. Parker, 25 Wash. 405, 65 P. 776.

" 'In a prosecution for conniving at. the prostitution of his wife, where accused had stated that a certain place at which he worked was a saloon and a restaurant, and that his wife stayed at the hotel which was at the same place, a statement by a juror in the jury room that, if the jurors would go to the house, "they would find it to be a house of prostitution yet," was ground for a new trial.' State v. Lorenzy, 59 Wash. 308, 109 P. 1064, Ann. Cas. 1912B, 153.

" 'Where a juror in a capital case makes a statement to his fellow jurors about material matters outside the evidence, and of a prejudicial nature, based on his personal knowledge, it will vitiate the verdict, unless no prejudice is clearly shown.' State v. Burton, 65 Kan. 704, 70 P. 640.

" 'It is reversible error for the jury, after retiring, to listen to statements of one of their number as to the credibility of a material witness.' Tate v. State, 38 Tex. Cr. R. 261, 42 S. W. 595.

" 'Where jurors in an arson case, familiar with the locality in question, explained to fellow jurors that certain tracks in question could not have been made by one R., and drew a plat to illustrate, the evidence being on a material issue, and not sworn to by any witness, there was reversible error.' Buessing v. State, 43 Tex. Cr. R. 85, 63 S. W. 318.

" 'In a prosecution for burglary, in which defendant claimed that he casually went into the room to await the arrival of a train, a statement by one of the jurors, after going

to the jury room, that defendant was lying, because, he (the juror) lived out that way, and the train did not stop there, was misconduct, authorizing a reversal of the conviction.' Dixon v. State, 46 Tex. Cr. R. 154, 79 S. W. 310.

" 'Where on a trial for burglary the jury at first stood seven to five for acquittal, whereupon one of them made statements derogatory to defendant's morals, and stated that he had refused him permission to visit his house, and that all the citizens of the immediate community had contributed $5 each to prosecute horse thieves, and, referring to another case, stated that he did not remember whether defendant belonged to the D. gang of thieves, etc., a conviction based on circumstantial evidence will be set aside.' Crow v. State, 47 Tex. Cr. R. 225, 82 S. W. 1033.

" 'Conduct of a juror in telling the jury, in the jury room, that defendant had hit prosecuting witness on the head with an ax handle on another occasion was ground for a new trial.' Mann v. State, 47 Tex. Cr. R. 250, 83 S. W. 195.

"Under the foregoing statement of facts and the above-cited authorities, we think that this plaintiff in error did not receive a fair trial by an impartial jury of twelve men, but that the jury did actually receive and consider outside evidence prejudicial to the rights of this plaintiff in error. We therefore respectfully submit to this honorable court our confession of error, and suggest that this cause should be remanded back for a new trial.".

After a careful examination of the record, we conclude that the confession of error is well founded. The facts as shown by the affidavits and evidence produced in support of the motion for a new trial stand undisputed by the state. Our Procedure Criminal provides that a new trial shall be granted when a verdict has been rendered against a defendant by which his substantial rights have been prejudiced, "when the jury have received any evidence out of court, other than that resulting from a view of the premises." Section 2754, Comp. Stats. 1921.

For such gross misconduct of the jury as appears from the proof in support of the motion for new trial, the verdict of the jury must be set aside, the judgment of conviction reversed, and a new trial granted to the defendant.

The warden of the penitentiary will surrender the defendant, Watson Ned, to the custody of the sheriff of Marshall county, who will keep him in custody until discharged therefrom according to law.

MATSON, P. J., and BESSEY, J., concur.