No. 67,493

STATE OF KANSAS, *Appellee,* v. CHARLES D. BOWSER, III, *Appellant.*

(847 P.2d 1231)

Opinion filed March 5, 1993.

*Wendy L. Rhyne Slayton,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with her on the brief for appellant.

*Michael Grosko,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The defendant, Charles Bowser, appeals from his jury convictions of three counts of aggravated robbery, K.S.A. 21-3427, and two counts of kidnapping, K.S.A. 21-3420. He was sentenced to imprisonment for a controlling term of 30 years to life.

Bowser was first tried in May 1991 on four counts of aggravated robbery, four counts of kidnapping, and one count of sexual battery. The charges arose from four separate incidents in which a female victim, upon arriving at work in the morning, was approached from behind by a knife-wielding man who demanded money, jewelry, and something with the victim's name and address on it. The jury found Bowser not guilty on two counts of kidnapping and one count of sexual battery. The jury could not

reach a verdict on the other six counts, and a mistrial was declared as to them.

In August 1991 Bowser was retried on the remaining two counts of kidnapping and four counts of aggravated robbery. The jury found Bowser guilty on the two kidnapping counts and three of the four aggravated robbery counts. The jury found him not guilty on the remaining aggravated robbery count.

Bowser raises two issues on appeal. First, he contends his constitutional and statutory rights to be present at all stages of trial were violated by the trial judge's ex parte communication with a juror.

During deliberations, the presiding juror sent a note to the district court judge which stated that juror Warrick wanted to be dismissed from service on the jury. In his chambers, the district court judge talked with the juror on the record. Bowser was not present, nor were the attorneys.

Juror Warrick told the district court judge that she wanted to be dismissed because 11 jurors had decided one way and she had decided the other way. Here is the discussion which followed:

"THE COURT: Ms. Warrick, I got a note from the presiding juror that just said that you would like permission to be dismissed.

"MS. WARRICK: Uh-huh.

"THE COURT: I don't want to discuss anything about the case or what the status is on deliberations or where the jury is, but was this at your request?

"MS. WARRICK: Yes.

"THE COURT: Can you tell me why you want to be dismissed?

"MS. WARRICK: Because I just can't do it.

"THE COURT: But this is one of the things I brought up yesterday early on how important it is.

"MS. WARRICK: Uh-huh.

"THE COURT: When you say you can't do it, you mean you can't make a decision or—

"MS. WARRICK: No, I can't make a decision like immediately like they want an immediate decision. I know I've heard all the evidence and all that stuff, but it's just I'm not convinced.

"THE COURT: Well, let me ask you this: I'm not asking you if you are convinced or not convinced, but you say you can't make a decision?

"MS. WARRICK: Uh-huh.

"THE COURT: There's a decision. The decision could be guilty or the decision could be not guilty.

"MS. WARRICK: Uh-huh.

"THE COURT: You're just saying you're in the middle or can't go—

"MS. WARRICK: Well, I've made my decision, but—

"THE COURT: All right. Then tell me one more time why you want to be dismissed.

"MS. WARRICK: It's because you say that everyone has to come up with the same decision.

"THE COURT: Yes, all twelve have to be the same for a verdict to be.

"MS. WARRICK: And my decision is not the same.

"THE COURT: Well, let me just—the reason I'm hesitating is we have to make a record. I have to make sure that I don't have any illegal conversations with you as a juror.

"MS. WARRICK: Uh-huh.

"THE COURT: But I'm reading between the lines. What I hear you're saying is eleven of them are saying one thing and you're saying another.

"MS. WARRICK: Right.

"THE COURT: And are you telling me the reason you're saying another is because in viewing the evidence and the way you see it, that's the way you feel your vote should be?

"MS. WARRICK: Right.

"THE COURT: And apparently they're telling you that they all see it another way and they all think that you're wrong?

"MS. WARRICK: Right.

"THE COURT: And you're not telling me you can't make a decision, you're just saying, 'I don't agree with them.'

"MS. WARRICK: Right.

"THE COURT: Do you have sufficient time—would you like—you know, it's about time to go home now. You want to go home tonight and think it over? If it's just because your vote is different, I can't excuse you thinking somebody else might agree with them is what I'm saying to you.

"MS. WARRICK: Uh-huh.

"THE COURT: But if in good conscience you've done everything the law requires and you've looked at the evidence and you believe that the way you're voting is the correct way, then I wouldn't ask you to change it. You know, as long as you haven't got some outside influence or as long as you didn't come in with a predisposed idea of how you should vote, I won't ask you to change it. I'll ask you this: Have you listened to their discussions and have you discussed back and forth as to everybody's feelings?

"MS. WARRICK: Yes, we have.

"THE COURT: And you still feel that your way is the way in your heart is correct?

"MS. WARRICK: Right.

"THE COURT: I can't dismiss you just because you're different.

"MS. WARRICK: Okay.

"THE COURT: You know, if you told me, 'Judge, my religious reasons or my moral reasons or something, I can't do this. I thought I could do it,

but I can't.' Then I would think about dismissing you, but I can't just dismiss you just because your vote might be different from the other eleven.

"MS. WARRICK: Well, let me put it this way then. I will say because I thought that I could, but maybe it is because of my religious reasons, because Jesus Christ is Judge. Judge not, lest you be judged. And I cannot in good conscience say, 'Yes, this man is guilty,' when I'm not convinced that he is, you know. I mean I have some reasonable doubt, and I would hate to send someone to the penitentiary for life and he was not guilty.

"THE COURT: You're telling me two different reasons.

"MS. WARRICK: Am I?

"THE COURT: Well, what I'm saying is this—you're saying, 'Judge, I've thought this out and you've got the law that you've told me and I'm following that law and I can't find him guilty.' And you're also telling me, 'Jesus Christ—or I cannot judge others'—

"MS. WARRICK: Uh-huh.

"THE COURT: If it's both of those—if it was just the one—and don't get the idea I'm not trying to get you to say magic words to me, because I'm not. If it was just the one, then there's no problem. But if you believe in your heart that the evidence isn't there and if you have a reasonable doubt and it's a valid reasonable doubt, I wouldn't ask you to change your mind. The only thing I ask you is that all twelve jurors listen to each other's bases for their decision, listen to what it would be. And if you feel like you have a valid decision, I'd want you to stick with it, but I want you to be open minded and I'd want the eleven people other than you to be open minded and be able to discuss it and see what their story is.

"MS. WARRICK: Okay.

"THE COURT: Now, is there any question you might want to ask me that I haven't brought up or anything?

"MS. WARRICK: No.

"THE COURT: Okay. Well, I'm going to send you back in there.

"MS. WARRICK: Uh-huh.

"THE COURT: And if you'd like to ask me anything or tell me anything in the morning as long as you don't tell me anything about deliberations— I started to say I don't know which way you stand, but I guess after that last statement, I do know.

"MS. WARRICK: Yeah.

"THE COURT: I just can't dismiss you for the bases of what you've told me.

"MS. WARRICK: Okay.

"THE COURT: It's not fair to anybody. And nobody knows what's right or wrong, but as long as you're following the instructions and as long as you're doing in good conscience what the law says you do, just because you're different is not a reason for me to dismiss you.

"MS. WARRICK: Okay.

"THE COURT: All right?

"MS. WARRICK: All right."

The district court judge had said to juror Warrick, "[I]t's about time to go home now." After sending her back to the jury room, the judge met briefly with counsel. He told the prosecuting attorney and Bowser's attorney of his discussion with the juror. The prosecutor stated, "I have no problem with the way you handled it." Defense counsel stated, "I don't see much else you could do." The jurors were returned to the courtroom, and the judge announced that it was "twelve minutes to 5:00, so I'm going to send you home until tomorrow morning." The jurors were asked to be present to begin deliberating at 8:50 the next morning.

Sometime the following morning the jury returned its verdict. The record does not indicate what time the jury returned its verdict; however, the jury verdict was file-stamped at 10:35 a.m. Defense counsel did not request that the jurors be polled.

A criminal defendant's federal constitutional right to be present at all stages of trial "is rooted to a large extent in the Confrontation Clause of the Sixth Amendment," but the United States Supreme Court has "recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526, 84 L. Ed. 2d 486, 105 S. Ct. 1482 (1985). A defendant has a due process right to be present at a proceeding where a "fair and just hearing would be thwarted by his absence." *Snyder v. Massachusetts*, 291 U.S. 97, 108, 78 L. Ed. 674, 54 S. Ct. 330 (1934).

In Kansas a criminal defendant's statutory right to be present is found in K.S.A. 22-3405. It provides in pertinent part as follows: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law." This court has held that the failure to have defendant present at a conference in the judge's chambers between the judge and a juror is a "clear violation of the statute." *State v. Knapp*, 234 Kan. 170, 180, 671 P.2d 520 (1983).

In addition, K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

No Kansas cases have been brought to the court's attention, however, in which a conviction was reversed on this ground. The convictions have been upheld either because the defendant waived the right to be present, see, *e.g., State v. Sandstrom,* 225 Kan. 717, 721-22, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979), or because the error was harmless, see, *e.g., Knapp,* 234 Kan. at 182, and *State v. Lovely,* 237 Kan. 838, 845, 703 P.2d 828 (1985); in other words, because a "fair and just hearing" had not been thwarted by the defendant's absence.

The State does not contend that Bowser waived his right to be present during the in chambers conference with the juror.

Bowser contends that his absence "cannot be deemed harmless error" because the outcome of his trial might have been different if he had been present. The actual standard where a federal constitutional error is at issue requires the court to find beyond any reasonable doubt that there is little, if any, likelihood that the error changed the outcome of the trial. *State v. Knapp,* 234 Kan. at 182.

In order to meet this standard, the State argues, it must be shown that juror Warrick's position changed as a result of her discussion with the judge. Bowser contends that Warrick's position did change as a consequence of the discussion. He contends that the communication had a "coercive effect and was the catalyst for the unanimous verdict later reached by the jury."

Bowser specifically objects to the judge's failure to "explain the option of a hung jury" to Warrick. He contends that Warrick held the "mistaken belief that a unanimous vote was required." If he or his counsel had been present, the argument seems to be, Warrick would have been advised that there are occasions when jurors fail to reach a unanimous decision.

In *Knapp* and *Lovely,* this court concluded that the communications outside defendant's presence were harmless. In *Lovely,* the "totality of the circumstances" was declared to weigh against

a finding of harm. The totality included defense counsel's expressly declining to request a mistrial. 237 Kan. at 845.

In *Knapp*, the overwhelming evidence of guilt seems to have been the basis for this court's conclusion that the communication did not tip the scale. 234 Kan. at 180-81. The present case is readily distinguishable. The *Knapp* juror gave no clue as to her view of the evidence. Her concern was that her brother had been questioned during investigation of the case. The court had no indication from the communication which way the juror was leaning, and "Knapp's counsel wanted her left on the jury as he felt she would be a good juror for the defense." 234 Kan. at 179. The court had no way to measure or even to infer whether the communication caused her to change her position. Thus, the court looked to the weight of the evidence to reach a conclusion as to the likelihood that the meeting caused a change.

This issue was recently addressed in *Crease v. State,* 252 Kan. 326, 845 P.2d 27 (1993). There, the issue was raised for the first time in a K.S.A. 60-1507 motion filed some 10 years after Crease's conviction. The ex parte communication between the judge and at least one juror occurred on the morning of the third day of deliberations. No record was made of the ex parte communication. The juror was concerned about finding Crease guilty of murder if he was not the one who pulled the trigger. The ex parte communication with the judge related to the application of the felony-murder and aiding and abetting instructions.

We held the ex parte communication violated Crease's constitutional right to be present at all critical stages of his trial. We then considered if the error was harmless, stating the standard of review as follows:

" 'An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. [Citations omitted.] Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]' *State v. White,* 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

See *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986); *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Peltier,* 249 Kan. 415, 426, 819 P.2d 628 (1991), *cert. denied* \_\_\_\_ U.S. \_\_\_\_, 120 L.

Ed. 2d 875 (1992). On appeal, the defendant has the burden of showing the error substantially prejudiced his or her rights. [*State v.*] *Garcia,* 233 Kan. [589,] 596 [, 664 P.2d 1343 (1983)]." 252 Kan. at 334.

Applying that standard, we concluded the error was harmless:

"Obviously, there is substantial competent evidence to support the findings of the district court in this case. That is not the standard of review, however. Our standard of review on this issue requires a review of the entire record by this court. 'Since *Chapman,* we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citation omitted.]' *Delaware v. Van Arsdall,* 475 U.S. at 681.

"Our examination of the entire trial transcript convinces us the error was harmless beyond a reasonable doubt. The record indicates that Crease and his accomplice, or accomplices, committed an aggravated burglary and that one of the burglars carried a high-powered rifle and one carried a handgun similar to one a witness previously had observed in Crease's bedroom. Crease's own testimony acknowledged his participation in the burglary and his awareness that at least one rifle was carried into the house in which the sleeping couple was shot and killed during the burglary. Given the burglary convictions, only if one or more of the jurors did not follow the instructions could there have been a hung jury or an acquittal on the felony-murder charges.

"Brinkley testified that the judge did not pressure her and that she had not decided how she would vote when she left his chambers. No objection was, or is, made to the trial judge's instruction to the jury in response to Brinkley's written question. Several hours later the jury returned its verdict of guilty.

"We are convinced the ex parte communication between the judge and juror, or jurors, had little, if any, likelihood of changing the verdict, and thus we hold the error to be harmless beyond a reasonable doubt." 252 Kan. at 335-36.

In the present case, in contrast, it seems apparent that the judge's dialogue with juror Warrick changed the outcome of the trial. When Warrick spoke with the judge, she told him that she had made her decision and stated: "I know I've heard all the evidence and all that stuff, but it's just I'm not convinced." Then she told the judge that she wanted to be dismissed "because you say that everyone has to come up with the same decision." After she revealed to the judge that she was the holdout against the 11 other jurors, he mixed assurances that he was not asking her to change her mind with counsel to be open-minded and to listen to the other jurors' reasoning. Then he sent her back to the jury

room to resume deliberating. A reasonable inference is that she concluded that the judge wanted her to participate with the other jurors in reaching verdicts irrespective of her individual judgment, and the verdicts the following morning tend to confirm this supposition.

Further, the jury did not find the evidence against Bowser, particularly as to identification, to be overwhelming. The first trial resulted in not guilty verdicts on three counts and the jury being unable to reach a verdict on the remaining six counts. On retrial, juror Warrick, prior to her meeting with the judge, had decided that Bowser was not guilty.

In *United States v. United States Gypsum Co.,* 438 U.S. 422, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978), a criminal prosecution under the antitrust laws, the defendants raised the question of the propriety of a mid-deliberation ex parte meeting between the judge and the foreman of the jury. The Supreme Court affirmed the Court of Appeals' reversal of the convictions on other grounds, but added that reversal would have been justified solely on the basis of the ex parte meeting. 438 U.S. at 462. Although the reasoning of the Supreme Court did not depend on the defendants' right to be present, it is enlightening in the circumstances of the present case.

On the seventh day of deliberations, the federal district court judge received a request to meet with the jury foreman. He secured acquiescence of counsel to meet alone with the juror. During the meeting, the juror referred to the jury's deadlock and the judge indicated he would take that into consideration but he wanted the jury to continue deliberations:

"THE COURT: I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me. That is all I can say.

"MR. RUSSELL: I appreciate it. It is a situation I don't know how to help you get what you are after.

"THE COURT: Oh, I am not after anything.

"MR. RUSSELL: You are after a verdict one way or the other.

"THE COURT: Which way it goes doesn't make any difference to me." 438 U.S. at 432.

The following morning the jury returned guilty verdicts against the defendants.

The Supreme Court stated:

"We find this sequence of events disturbing for a number of reasons. Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. First, it is difficult to contain, must less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements. . . .

". . . [I]t is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is—which constitutes the error, rather, it is the fact that the *ex parte* discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

"While it is, of course, impossible to gauge what part the disputed meeting played in the jury's action of returning a verdict the following morning, this swift resolution of the issues in the face of positive prior indications of hopeless deadlock, at the very least, gives rise to serious questions in this regard. . . .

"We are persuaded that the Court of Appeals would have been justified in reversing the convictions solely because of the risk that the foreman believed the court was insisting on a dispositive verdict; a belief which we must assume was promptly conveyed to the jurors. The unintended direction of the colloquy between the judge and the jury foreman illustrates the hazards of ex parte communications with a deliberating jury or any of its members." 438 U.S. at 460-62.

In the present case, the ex parte communication between the judge and juror Warrick was error in that it violated the defendant's constitutional and statutory rights to be present at all critical stages of his trial.

The reasonable inference to be drawn from the record is that, as a result of the ex parte meeting, juror Warrick was influenced to change her position. We cannot declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the verdict, and therefore we do not find the error to be harmless.

In light of our finding, we need not address the second issue raised by the defendant.

Reversed and remanded for a new trial.