No. 66,047

Lydia Saucedo, *Appellant,* v. Ray Winger, M.D., *Appellee.*

(850 P.2d 908)

Opinion filed April 16, 1993.

*Gene H. Sharp,* of Neubauer, Sharp, McQueen, Dreiling & Morain, P.A., of Liberal, argued the cause and was on the brief for appellant.

*Ray H. Calihan, Jr.,* of Calihan, Brown, Burgardt & Wurst, of Garden City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff appeals a jury verdict in favor of defendant doctor in her medical malpractice action. On appeal, plaintiff contends that the trial judge erred by not setting aside the judgment for the defendant because of jury misconduct. The Court of Appeals affirmed the district court in an unpublished opinion filed May 22, 1992. We granted the plaintiff's petition for review pursuant to K.S.A. 20-3018(b).

Lydia Saucedo commenced a malpractice action against Dr. Ray Winger, alleging that the doctor's negligent diagnosis and treatment caused or substantially contributed to the death of her husband, Pablo, from cardiac infarction or cardiac arrhythmia. Dr. Winger's defense was that Pablo died of respiratory failure from inhaling vomit into his lungs, not of a heart attack.

At trial, Ralph Medina, a friend of Pablo and Lydia, testified that during Thanksgiving Day he, his brother, and Pablo consumed as much as four and one-half cases of beer. Lydia testified that she believed Pablo had about 12 beers at Medina's house, but Pablo and the two others could have consumed as much as four and one-half cases. Lydia estimated that they left Medina's house around 2:30 A.M. She stated that she teased Pablo about having a hangover the morning after Thanksgiving.

Pablo, Lydia, and their two young sons went to the office of Dr. Winger that morning. Lydia and her sons were with Pablo throughout the visit to Dr. Winger's office. Dr. Winger's nurse, Patricia Phillips, inquired as to Pablo's complaints and took a brief history. She noted on the chart: "Sharp pain in chest—started about 2 [hrs] ago; Arms numb; No Meds; B/P-130/84; NKA; T-98.0."

Dr. Winger examined Pablo and ordered a chest x-ray. Dr. Winger diagnosed Pablo as having gastroenteritis with possible

bronchitis. Pablo was given an injection of an antibiotic and a quantity of Maalox antacid. Pablo was then sent home with instructions to rest, to continue taking antacids, and to return if he did not get better.

Lydia testified that after leaving Dr. Winger's office, they picked up Pablo's paycheck at his place of employment and when they returned home Pablo lay down on the couch. Lydia went outside the house to hang some clothes. When she came back in the house, 5 or 10 minutes later, she saw Pablo lying on the floor jerking, and his lips and cheeks were purple. Lydia had her next-door neighbor stay with Pablo while she went to get her sister. When Lydia returned home, Pablo's body was lying on the floor covered with a blanket, and she was told that Pablo had died.

Hospital records indicated that when the ambulance crew arrived Pablo had no vital signs, CPR was commenced, and Pablo was transported to the hospital. The emergency room chart indicated that Pablo was "D.O.A.," with no vital signs. A variety of resuscitative techniques was attempted in the emergency room. The emergency room notes indicate: "[R]epeated attempts to intubate unsuccessful. . . . Continuous emesis of stomach contents, with [high percentage] of what is apparently antacid." At Lydia's request, no autopsy was conducted.

Dr. Jack Perkins, plaintiff's expert medical witness, testified that it was unlikely that Pablo died from inhaling vomit into his lungs or as a complication of bronchitis and gastroenteritis. Although Dr. Perkins agreed with Dr. Winger's diagnosis that Pablo had bronchitis, it was his opinion that Pablo's death was due to a cardiac infarction or arrhythmia. Dr. Perkins testified that Dr. Winger was negligent in not ordering further tests to determine the condition of Pablo's heart.

The deposition of Lydia's uncle, Jesse Rodriquez, was admitted into evidence. Rodriquez stated that he last saw Pablo on the day before Thanksgiving (two days before Pablo died). Rodriquez said that when he arrived at the hospital, just after Pablo had died, he met Dr. Winger in the hospital and inquired as to the cause of Pablo's death. Rodriquez testified that Dr. Winger told him that Pablo could have died of a heart attack.

The defense presented several witnesses, including two members of the ambulance crew that treated Pablo. Kenton Brechbuhler, one of the crew members, stated that there was vomit on the side of Pablo's face. He described the vomit as "a mixture of white and gastric contents." He stated that during CPR Pablo's stomach contents were moving into Pablo's mouth with each compression of his chest. Janice Hickey, another crew member, described a white substance on the carpet and around Pablo's mouth.

Dr. Lawrence Perry, defendant's expert medical witness, testified that in his opinion Pablo probably died from respiratory failure of some sort. Dr. Perry indicated that struggling or jerking and a change in coloration could indicate that Pablo's lungs were not functioning. It was Dr. Perry's opinion that it was unlikely Pablo died from a myocardial infarction or any type of heart attack.

It is important to note that there is conflicting evidence as to what occurred during Dr. Winger's examination of Pablo. Dr. Winger noted on Pablo's chart "Spanish speaking only. . . . Low sternal chest pains & epigastric pain also vomit 6-7 [times] this A.M. . . . Both children had vomit/dia that resolved two days ago. . . . Lungs clear but shallow breath. [Chest x-ray with increased] bronchial markings. [T]ender epigastrium. [I]mp: Gastroenteritis [with] poss[ible] Bronchitis." Dr. Winger admitted that he made these notations on Pablo's chart after he had learned of Pablo's death.

In his deposition taken prior to trial, Dr. Winger first stated that he had obtained that information from the Saucedos' daughter. (The Saucedos have two boys and no daughter.) At trial, Dr. Winger testified he talked to Pablo in Spanish but, when he had difficulty understanding Pablo, he asked one of the boys to help him. Dr. Winger said he was not sure whether the information about Pablo vomiting that morning came from Pablo or from the boys. He also said that the information about the children having diarrhea and vomiting two days earlier had come from either Pablo or one of the boys.

Lydia's testimony of what occurred during the doctor's examination of Pablo directly contradicted Dr. Winger's version of events. Lydia testified that Pablo spoke some English to Dr.

Winger during the examination. Lydia testified she was fluent in both English and Spanish. (Dr. Winger was not aware of this fact until Lydia Saucedo's deposition was taken prior to trial.) She said that the children did not say anything during the examination and that no one told Dr. Winger that Pablo had vomited that morning. Lydia claimed that Dr. Winger's notations on Pablo's record that there was no history of high blood pressure, no history of chest pains, no blood in vomitus, and no blood in stools had no basis in fact because these subjects were not discussed during the examination. She stated the notation about the children being sick was totally false because the children had not been sick and the doctor had not asked the children whether they had been sick. Lydia stated that Dr. Winger never listened to Pablo's heart or lungs during the examination nor did he physically touch her husband.

Near the end of the trial, Pablo's now 11-year-old son, Eric Saucedo, was called to the stand by the plaintiff to demonstrate that Dr. Winger did not obtain any medical history from Pablo through Eric as an interpreter because the boy, who was 8 years old at the time of the examination, could not speak Spanish. Eric testified:

"Q. Eric, do you speak Spanish at all?
"A. No.
"Q. Do you understand Spanish?
"A. No.
"Q. Do you ever talk to your mom in Spanish?
"A. No.
"Q. Can you?
"A. No.
"Q. Eric, do you remember back the day that your dad died, having gone to the doctor with your mom and your dad and your little brother?
"A. No, I don't remember.
"Q. You don't remember being at the doctor's office?
"A. No."

After the evidence had been presented and the jury instructed, the jury was given a series of special questions to answer which included:

"1. Did the procedures used by Dr. Winger in making his diagnosis and rendering care and treatment to Pablo Saucedo fall below the standard of

care required of a general family practitioner in Hugoton, Kansas, or communities of similar size, under the circumstances existing?"

"2. Did Dr. Winger's diagnosis and treatment of Pablo Saucedo, or the lack thereof, cause or substantially contribute to Pablo Saucedo's death or lessen his chances for survival?"

The jury answered the first question "Yes" and the second question "No." The trial judge entered judgment for Dr. Winger and discharged the jury.

After the trial, Lydia submitted to the trial judge affidavits of three jurors which admitted misconduct and a motion to recall the jury. All three affidavits indicate that while the jury was deliberating, a juror, Alan Bultman, informed the jury that his daughter attended school with Eric Saucedo. According to the affidavits, Bultman told the jury that after Eric Saucedo had testified Bultman asked his daughter if Eric could speak Spanish and that his daughter told him that Eric could speak Spanish and did so regularly. Two of the affidavits also allege that during deliberations an unnamed juror stated that Jesse Rodriquez, Pablo's uncle, was a cocaine dealer and that it was possible that Pablo died of a cocaine overdose. All three affidavits indicate that a majority of the jury initially voted "yes" to both of the questions submitted.

The judge agreed that the statements of juror Bultman constituted jury misconduct, but found that the juror's misconduct was limited to whether Dr. Winger was negligent in his examination of Pablo and did not substantially affect the jury's determination as to the cause of Pablo's death. As to the juror's comment that Jesse Rodriquez was a cocaine dealer, the trial judge stated it was "the sort of a 'wild comment' that is part of the mental processes of hammering out a jury verdict" and could not be seriously considered as affecting the judgment of the jury; therefore, it was not grounds for a new trial. The judge denied Lydia's motion to recall the jury and her request for a new trial. Plaintiff appealed.

Both parties cite prior Kansas cases in support of their arguments as to whether under these facts the misconduct so prejudiced the jury that the plaintiff was entitled to a new trial. Lydia relied on *State v. Stuart*, 129 Kan. 588, 283 Pac. 630 (1930), and *Kincaid v. Wade*, 196 Kan. 174, 410 P.2d 333 (1966). In *Stuart*,

after the defendant had been convicted of possession of intoxicating liquors, one of the jurors testified at the hearing on the defendant's motion for a new trial that as soon as the jury retired he asked his fellow jurors if in considering the case it would be all right to state his personal knowledge of the witnesses. Another juror told him that it would be all right to do so. He then told the other members of the jury that he was personally acquainted with the two witnesses who had testified on behalf of defendant, that they were heavy drinkers and it was just a case of one of the bunch trying to protect another, and that they were trying to help the defendant. When the jury was recalled by the judge, all jurors admitted that the juror had made the statements during their deliberations and the statements were repeatedly discussed during the deliberations.

The *Stuart* court noted it is the duty of the jury to make its findings upon evidence regularly introduced in the trial and not upon the personal knowledge of jurors. A statement of fact by a juror to his fellow jurors of his personal knowledge of facts involved in the case is misconduct, but not every act of misconduct requires the granting of a new trial. If the misconduct is trivial, or not such as to influence the jury, the misconduct will not vitiate a verdict. But if facts outside of the evidence are brought before the jury based on the personal knowledge of a juror and those facts are likely to have influenced the minds of other jurors, the verdict should be set aside. (*State v. Duncan*, 70 Kan. 883, 78 Pac. 427 [1904]; *State v. Lowe*, 67 Kan. 183, 72 Pac. 524 [1903]; *State v. Burton*, 65 Kan. 704, 70 Pac. 640 [1902]; *State v. McCormick*, 57 Kan. 440, 46 Pac. 777 [1896].) The *Stuart* court stated it was obvious that the extraneous statements brought before the jury were prejudicial in character and naturally would have an effect upon the minds of the jury. It determined not only that the misconduct showed prejudice by the juror, but also that the juror's statements were of a kind that were likely to influence other jurors, and the State did not attempt to show that defendant did not suffer prejudice by the misconduct. The *Stuart* court held that this type of misconduct required reversal of the conviction.

In *Kincaid*, plaintiff filed an action to recover damages for injuries he received in an automobile collision. The jury returned

a verdict for only $300 more than the plaintiff claimed in actual damages. Kincaid appealed, claiming the verdict was so inadequate it indicated passion and prejudice because of jury misconduct. At the hearing on Kincaid's motion for a new trial, it was revealed that three jurors followed the defendant in an automobile to observe her driving habits, which were at issue in the case.

The *Kincaid* court noted it was misconduct for members of a jury to follow an automobile being driven by one of the parties for the purpose of observing the driver's habits where the information obtained is then used in the jury's deliberations and failure to display a stop or turn signal was a material factual issue in the case. It observed a juror may not be questioned or evidence received, for the purpose of challenging a verdict, as to what influenced the mental process of the jurors or concerning the mental process by which a verdict was reached. The *Kincaid* court concluded that, in challenging a verdict for misconduct of the jury, a juror may be questioned or evidence received as to physical facts, conditions, or occurrences, either within or without the jury room, which were material to the issues being determined. The *Kincaid* court held the conduct of the jury was prejudicial and granted a new trial.

Dr. Winger relies on *State v. Arney*, 218 Kan. 369, 544 P.2d 334 (1975), and *State v. Fenton*, 228 Kan. 658, 620 P.2d 813 (1980). In *Arney*, after the defendant had been convicted of two counts of kidnapping, one count of aggravated battery, and one count of murder, the defendant learned that a juror had driven his car to the scene of the crime, investigated the area, timed the drive from the crime scene to the defendant's home, and reported the results to his fellow jurors. The defendant did not question the sufficiency of the evidence but requested that the verdict be set aside due to the misconduct of the jury. Without recalling the jury, the trial judge ruled that under the facts this misconduct did not constitute sufficient cause for a new trial.

On appeal, the *Arney* court noted it was not disputed that such conduct on the part of the juror was wrongful and in violation of K.S.A. 22-3413, thereby subjecting the errant juror to the possibility of contempt proceedings. The question for the trial court to determine on the motion for new trial was whether the juror's misconduct necessitated a new trial. Defendant argued the

juror's personal investigation permitted the jury to consider matters which were not in evidence and thereby deprived him of his constitutional right to confront the witnesses against him, as provided by the Sixth Amendment to the United States Constitution and § 10 of the Bill of Rights of the Kansas Constitution.

The *Arney* court agreed that a criminal defendant is denied his constitutional right to confront the witnesses against him when a juror conducts an independent investigation of a material issue of fact and reports the results thereof to the jury during its deliberations. The *Arney* court observed that the majority of the states which have considered the question of the unauthorized view of the scene of the crime by a juror have followed the rule that such conduct is not to be considered as grounds for reversal in the absence of a showing that the material rights of the accused were prejudiced thereby. It observed that even if an accused is denied his constitutional right to confront the witnesses against him when a juror conducts an independent investigation of a material issue of fact and reports the results thereof to the jury during its deliberations, it will not be grounds for reversal if the juror's misconduct is harmless beyond a reasonable doubt. Although *Arney* acknowledged that this was clearly misconduct, it noted the defendant had not challenged the sufficiency of the evidence and that the trial court in considering the evidence in support of the motion for new trial was aware that the evidence establishing the guilt of the defendant was substantial. In addition to eyewitness identifications by three victims, there was persuasive circumstantial evidence implicating defendant. The matter improperly investigated by the juror and discussed with the other members of the jury did not relate to a material issue in dispute. The *Arney* court refused to reverse the conviction because there was no evidence that the defendant was prejudiced by the jury's misconduct.

In *Fenton*, 228 Kan. 658, several days after the defendant had been convicted of first-degree murder, a juror told the defendant that three of the jurors told the other members of the jury they had heard a threat that Fenton would kill the jurors if he was convicted. The defendant filed a motion for a new trial, claiming jury misconduct prevented him from receiving a fair trial. The trial court held an evidentiary hearing to determine the nature

and source of the threat and whether the threat had a prejudicial effect on the defendant's rights. At the evidentiary hearing three of the jurors testified that they had heard about the threat prior to the jury's deliberation. The remaining nine jurors heard about the threat while still in the jury room but after the verdict had been determined. When questioned by the trial judge, each of the jurors stated the rumor did not affect his or her decision. The trial judge denied Fenton's motion for a new trial.

The *Fenton* court noted that in recent years this court has consistently adhered to the rule in both civil and criminal cases that juror misconduct is not grounds for reversal, new trial, or mistrial unless it is shown to have substantially prejudiced a party's rights. The party claiming prejudice has the burden of proof. It stated that juror misconduct is a broad label which has been used to describe such matters as communications with jurors from others, the unauthorized viewing of premises, or reading of newspaper articles. The *Fenton* court concluded that under the facts presented there the trial court properly questioned the jurors about the effect of an alleged threat upon their decision. It observed that the threat was not a matter which had been placed in evidence or a matter inherent in the verdict itself. The court noted that K.S.A. 60-444 permits inquiry into extraneous matters which may have a material bearing upon the validity of the verdict. The trial court's conclusion that the rights of the defendant were not substantially prejudiced by the jurors' misconduct was upheld on appeal.

At trial, Lydia had three major hurdles to overcome in proving her medical malpractice claim. First, she needed to prove that Dr. Winger's treatment of Pablo fell below the required standard of care, *i.e.*, that Dr. Winger was negligent. Second, she had to prove the doctor's negligence caused or substantially contributed to Pablo's death. Third, she had to prove that she sustained damages because of Pablo's death. The jury found that although Dr. Winger's diagnosis and treatment of Pablo fell below the required standard of care, Dr. Winger's negligent diagnosis and treatment of Pablo did not cause or substantially contribute to Pablo's death or lessen his chances of survival.

We agree with the trial judge and the Court of Appeals that juror Bultman's communication to the jury about his daughter's

statement as to Eric Saucedo's Spanish-speaking abilities and the unknown juror's statement that Pablo's uncle was a cocaine dealer and it was possible that Pablo died of a cocaine overdose constitute juror misconduct. The question is not, as stated in the cases discussed by the parties, whether this misconduct substantially prejudiced the plaintiff's rights to a fair trial but whether the rights of the plaintiff were substantially affected by misconduct of the jury. See K.S.A. 60-259(a) *First.*

As to the first question submitted to the jury, the Court of Appeals noted that the jury concluded Dr. Winger *did not* conduct an adequate examination, *i.e.*, Dr. Winger's conduct fell below the required standard of care. The Court of Appeals concluded that the jury's misconduct as to Eric's ability to speak Spanish had not influenced the jury's determination of the ultimate cause of Pablo's death.

The Court of Appeals then considered whether the unnamed juror's statement that Jesse Rodriquez was a cocaine dealer and the juror's conclusion that since Pablo and Rodriquez were together two days before Pablo's death, Pablo's death might have been caused by a cocaine overdose improperly influenced the jury's finding that the doctor's treatment of Pablo did not cause or substantially contribute to Pablo's death. It noted the district court's ruling that, human nature being what it is, if every wild expression of opinion made in a jury room in the throes of hammering out a verdict could be made the basis for retrial, jury verdicts could seldom be preserved. The Court of Appeals stated such inquiries into the validity of jury verdicts, based on mental processes of the jurors, are foreclosed in Kansas, formerly by case law and now by statute. *Brown v. Hardin,* 197 Kan. 517, 523, 419 P.2d 912 (1966). The Court of Appeals concluded the district court did not abuse its discretion in denying the motion for new trial or recall of the jury.

We agree with the Court of Appeals' statement that upon an inquiry as to the validity of a verdict or an indictment no evidence can be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined. K.S.A. 60-441. A verdict may not be impeached by (1) questions

as to a juror's views or conclusions, or (2) questions as to the reasons for those views or as to factors used in determining those conclusions, or (3) questions involving what influences those views or involving factors which influence the mental process in reaching such conclusions. The mental process of a juror in reaching a verdict or the factors which influence the mental process cannot be inquired into for the purpose of impeaching a verdict. Public policy forbids the questioning of a juror on these matters for a very obvious reason, *i.e.*, there is no possible way to test the truth or veracity of the answers. *Kincaid v. Wade*, 196 Kan. at 178.

The Sixth Amendment to the United States Constitution sets forth an accused's right to a fair trial in a criminal action. Section 5 of the Kansas Constitution Bill of Rights guarantees the common-law right to a jury trial in civil actions. Implicit in the constitutional right to a civil trial is the right to a fair trial. The statutory prohibition of K.S.A. 60-441 against impeachment of a jury verdict does not apply when a party claims that his or her constitutional right to a trial by jury pursuant to § 5 of the Kansas Constitution Bill of Rights has been violated by jury misconduct. See K.S.A. 60-444. Where the rights of a party are substantially affected by the misconduct of a juror, there is an opposing matter of public policy to be considered and a new trial may be granted. See K.S.A. 60-259(a). Improper conduct on the part of a juror is charged to the entire panel, as the jurors operate as a unit, and public policy demands that misconduct be discouraged and, insofar as possible, prohibited. We have found it advisable to permit inquiry into a juror's misconduct which comes to the attention of other members of the panel and may be verified or denied. *City of Ottawa v. Heathman*, 236 Kan. 417, 420, 690 P.2d 1375 (1984). The burden is on the party seeking an order recalling the jurors to show the necessity for the order.

The granting of a new trial or recalling the jury to answer for misconduct is within the sound discretion of the trial court. K.S.A. 60-259. See *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621 (1989).

"Discretion is the freedom to act according to one's judgment; and judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts found after weighing and examining

the evidence—to act upon fair judicial consideration, and not arbitrarily. When so acting in a matter committed to the discretion of the court by the law the judgment ought not to be overruled by a reviewing court, for to do so would be to deny the right to exercise the discretion given by the law itself." *State v. Foren,* 78 Kan. 654, 658-59, 97 Pac. 791 (1908).

The abuse of discretion " 'is really a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.' (*Murray v. Buell and others,* 74 Wis. 14, 19, 41 N. W. 1010 [1889].)" *Deeds v. Deeds,* 108 Kan. 770, 774, 196 Pac. 1109 (1921).

" 'It is regrettable, though a fact, that the term "judicial discretion" has become so deeply embedded in legal nomenclature that any attempt to dislodge it would be futile. It is an anonyme to be endured and dealt with and explained in the unnumbered instances where, on account of merely an unhappy phraseology definitive of certain judicial powers administrative in their character, both courts and practitioners have been led into paths of rather uncertain reasoning. There is in reality seldom a pure strict sense that implies a power of decision in every phase, uncontrolled and uncontrollable by any supervisory authority. And while appellate reports are teeming with expressions to the effect that certain enumerated matters were in the discretion of the trial court, and therefore, would not be reviewed or disturbed, yet what is in fact meant is that such matters have been reviewed and that the decision of the trial court was right under the particular circumstances and consequently the decision would be permitted to stand.' " Overton, *The Meaning of Judicial Discretion,* in Judicial Discretion 3, 5 (Smithburn 1991).

"Legal discretion is a readily comprehended concept. It means nothing more than the application of statutes and principles to all of the facts of a case." *Shopiro v. Shopiro,* 153 P.2d 62, 66 (Cal. App. 1944). "Discretion in performing an act arises when it may be performed in [more than one way, any] of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Texas Indemnity Ins. Co. v. Arant,* 171 S.W.2d 915, 919 n.1 (Tex. Civ. App. 1943). A decision which is contrary to the evidence or the law is sometimes referred to as an abuse of discretion, but it is nothing more than an erroneous decision, or a judgment rendered in violation of law. *Griffin v. State,* 12 Ga. App. 615, 621, 77 S.E. 1080 (1913).

The trial judge has unfettered discretion when the ruling is not subject to appellate review. "In this situation, the trial judge

is much like the fictional king of common law who 'can do no wrong.' " Wallach, *Judicial Discretion: How Much*, in Judicial Discretion 8, 9. An example is the judge's right to grant or to refuse to grant probation where there is no statutory presumption for or against probation.

A high degree of appellate deference is allowed a trial judge's exercise of discretion in assessing the texture and feel of the trial, the credibility of witnesses, and the perceived impact of an allegedly prejudicial event. In these circumstances, appellate decisions often recognize a presumption of validity in the exercise of discretion because of the superior vantage point of the trial judge. The judge's decision will be affirmed even though the appellate tribunal might otherwise be inclined to take a precisely opposite view of the matter. An example of this presumptive validity of the trial judge's ruling includes orders sustaining a jury verdict and denying motions for a mistrial in a civil case particularly where the unsuccessful challenger relies upon the alleged insufficiency of the evidence to sustain the jury verdict. Another example is the trial judge's conclusion that the misconduct of counsel, or some other untoward event in the course of the trial, was not sufficiently grave to disturb the verdict. A third example is the judge's granting or denying adjournments and/or continuances.

"[T]he amount and degree of judicial discretion will vary depending on the character of the question presented for determination. In the vast majority of non-discretionary instances, the judge's choice must be made between competing rules of law, and once the case is properly categorized, the result is ineluctable. Less apparent perhaps is the proposition that once the occasion for a discretionary ruling appears, the amount and character of the discretion will vary widely. Yet that variance in the quantum of discretion is subject to some degree of systematic assessment." Wallach, at 12.

If a constitutional or a statutory right has been violated, the trial judge's use of discretion is limited. Under these circumstances there is a greater need for articulation by the trial judge of the reasons for his "discretionary" decision. Discretion must be exercised, not in opposition to, but in accordance with, established principles of law. It is not an arbitrary power. In its practical

application in this state, judicial discretion is substantially synonymous with judicial power.

An exercise of discretion which results in an error of constitutional magnitude is serious and may not be held to be harmless unless the court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before a judge may declare the error harmless, the judge must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Bowser*, 252 Kan. 582, Syl. ¶ 2, 847 P.2d 1231 (1993). See *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

Here, the jurors were instructed not to discuss the case with persons who were not members of the jury and to consider only the evidence introduced during their deliberations. The jurors violated their oath and discussed statements that were material to the issue which were not made under oath and subject to cross-examination. Because the jurors' misconduct was not discovered until after the jury had rendered a verdict, the trial judge did not have the opportunity to question the jurors about their misconduct and give additional instructions protecting the affected party's right to a trial by jury. Where a juror's misconduct relates to a material issue, the only way for a trial court to determine if the misconduct improperly influenced the jury's verdict is to recall the jury and inquire.

A review of the Kansas cases cited indicates the statutory prohibition against receipt of evidence to impeach a jury verdict by showing the mental process by which the verdict was determined does not apply where a party claims the constitutional right to a trial by jury has been violated by jury misconduct which has a substantial effect on the rights of that party. Where a party alleges jury misconduct, the trial judge is required to recall the jury if the judge cannot determine that the evidence supporting the other party is substantial and that the jury misconduct did not relate to a material issue in dispute. When the jury is recalled, a juror may be questioned or evidence received as to physical facts, conditions, or occurrences of a juror's misconduct, either within or without the jury room, which were material to the issues being determined.

We note that counsel has cited no cases where there were two separate acts of misconduct by jury members. In addition, the Court of Appeals in its statement of facts failed to consider that (1) the doctor first stated he obtained information from the young daughter, (2) the doctor was unaware that Pablo's wife was fluent in English and Spanish until her deposition was taken prior to trial, (3) the doctor made the notations on Pablo's chart after he learned of Pablo's death, and, (4) all three juror affidavits indicated that a majority of the jury initially voted "yes" to both questions submitted by the judge. We have reviewed the record and the Court of Appeals' unpublished opinion and conclude that plaintiff has shown that her right to a fair trial was substantially affected by the jury misconduct.

A party is denied the right to a fair trial when a juror introduces evidence on material issues of fact to the jury during its deliberations. Plaintiff did not receive a fair trial because, under the facts of this case, the two incidents of jury misconduct introduced extraneous evidence during jury deliberations which had a substantial effect upon the issues and the validity of the verdict. The trial judge's refusal to recall the jury and determine whether the extraneous evidence substantially affected the jury's verdict was error which requires that plaintiff receive a new trial.

Reversed and remanded for a new trial.

DAVIS, J., not participating.

MCFARLAND, J., dissenting: The issue before us is whether or not the trial court's denial of plaintiff's motion for a new trial constitutes an abuse of judicial discretion.

Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said the trial court abused its discretion. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 5, 845 P.2d 609 (1993).

A panel of the Kansas Court of Appeals consisting of Judges Davis, Larson, and Rulon has reviewed the record herein and unanimously concluded no abuse of judicial discretion has been shown. (Memorandum opinion filed May 22, 1992.) I agree with the panel's conclusion.

Issues involving claims of jury misconduct are very fact specific, both as to what misconduct occurred and as to the nature of the trial, including pertinent evidentiary matters and issues involved. Therefore, in order to view the alleged jury misconduct in proper perspective, it is necessary to set forth a rather detailed account of the pertinent issues and trial evidence. Inasmuch as this is a dissenting opinion, an effort must be made not to be unduly repetitive of that which is set forth in the majority opinion.

I agree with the majority opinion and the opinion of the Court of Appeals that the juror comment as to the child's ability to speak Spanish and speculation of cocaine overdose constitute jury misconduct.

As noted in the majority opinion, in order to prevail the plaintiff had to prove three claims: "First, she needed to prove that Dr. Winger's treatment of Pablo fell below the required standard of care, i.e., that Dr. Winger was negligent. Second, she had to prove the doctor's negligence caused or substantially contributed to Pablo's death. Third, she had to prove that she sustained damages because of Pablo's death."

It is uncontroverted that plaintiff sustained damages as a result of Pablo's death, and that claim is not involved herein.

Let us look first at the first claim, that Dr. Winger was negligent. An unknown man in his mid-30's comes to a physician's office complaining of chest pain and numbness in his arms. Both of plaintiff's medical experts testified that by virtue of these symptoms (especially in a new patient) heart disease had to be considered as a possible cause thereof. In order to rule cardiac problems out, Dr. Winger should have ordered an EKG test. One of the experts felt certain enzyme tests should also have been ordered. Both testified the failure to order the EKG was negligence, with one expert testifying the failure to order the enzyme testing was also negligent.

The following special questions were submitted to the jury:

"1. Did the procedures used by Dr. Winger in making his diagnosis and rendering care and treatment to Pablo Saucedo fall below the standard of care required of a general family practitioner in Hugoton, Kansas, or communities of similar size, under the circumstances existing?"

"2. Did Dr. Winger's diagnosis and treatment of Pablo Saucedo, or the lack thereof, cause or substantially contribute to Pablo Saucedo's death or lessen his chances for survival?"

The jury answered question No. 1 in the affirmative. Whether or not the child spoke Spanish was relative only in determining whether Dr. Winger conducted an adequate examination of Pablo at the doctor's office. It had nothing to do with the issue of the cause of Pablo's death. On the issue of whether Dr. Winger's conduct fell below the standard care, the plaintiff prevailed. The plaintiff has the burden of proof to show prejudice. Inasmuch as she prevailed on the only claim that the comments about the child related to, I find no basis for concluding that the trial court's refusal to grant a new trial on this ground constitutes an abuse of discretion.

Let us focus on the second claim that plaintiff had to prove— that Dr. Winger's conduct caused or contributed to Pablo's death. This is the claim involved in the cocaine comment.

There was no autopsy performed herein at plaintiff's request. Accordingly, no pathologist testified as to the cause of death. Plaintiff called two physicians to establish cause of death (the same two who testified as to standard of care). The facts available to each were Pablo's medical records compiled on the day of his death (from Dr. Winger and the local hospital). Dr. Winger diagnosed Pablo as suffering from bronchitis and gastroenteritis. Both of plaintiff's experts agreed with this diagnosis.

It was the theory of the plaintiff that Pablo died from coronary disease, either a myocardial infarction or cardiac arrhythmia. It was defendant's theory that Pablo died of asphyxia from inhaling vomit. There was evidence supporting each of these possible causes of death. Plaintiff's experts did not give strong testimony on the cause of death, but for purposes herein let us assume death was from coronary disease. What evidence was there that Dr. Winger caused or contributed to Pablo's death?

On the morning in question, Pablo went to work. He came home about 10:00 a.m. complaining of chest pains and arm numb-

ness. Pablo had no regular physician, so Pablo and his family went to Dr. Winger that morning. It was after 11:00 A.M. when Pablo was examined by Dr. Winger. The doctor's office is a short distance from the local hospital in an adjacent or nearby building. After the consultation, Pablo was directed to walk to the hospital for a chest x-ray. This he and his family did and Dr. Winger joined them when notified the x-ray was ready. Dr. Winger looked at it, was dissatisfied with the quality of the picture, and directed that another be taken. This was done.

Pablo was sent home a little before noon. He stopped by his workplace where his paycheck was picked up and went home from there and laid down. Almost immediately, he went into convulsions, and his face turned purple. An ambulance was summoned. Despite attempts to revive him, no vital signs were exhibited. He was transported back to the hospital. Plaintiff testified that about 30 minutes had elapsed between the time they left the hospital and returned thereto. Resuscitation was attempted and Pablo was pronounced dead shortly before 1:00 p.m.

Evidence lacking in this case is significant. Neither of plaintiff's medical experts testified Dr. Winger should have treated Pablo as a medical emergency and had him transported for immediate hospitalization. Neither faulted Dr. Winger for having the patient walk to the hospital for the x-ray. One expert testified persons having myocardial infarction have a good survival rate if hospitalized, but neither said Pablo should have been hospitalized by Dr. Winger. One expert stated an EKG takes about 10 minutes, and the enzyme test can take as little as one hour to perform.

One must keep in mind the short time frame involved herein. The evidence of Dr. Winger's falling below the standard of professional conduct was failure to order additional tests. There was no testimony that the failure to order the test or tests caused or contributed to Pablo's death or that, if Dr. Winger had performed properly, Pablo would have survived or been more likely to survive.

In the context of these facts, we have a juror comment that the plaintiff's uncle was a cocaine dealer and had been with Pablo two days previous to his death and the speculation that Pablo might have died of a drug overdose. One note of explanation is

in order here: The uncle's having been with Pablo two days before his death came out in the evidence and was not a part of the jury misconduct.

The trial court herein characterized the cocaine statement as a "wild comment," which was a part of the mental processes of hammering out a jury verdict that cannot seriously be considered as affecting the judgment and is not grounds for a new trial. The court found the comments of juror Bultman to be jury misconduct, but that this misconduct did not substantially affect the jury's determination of the cause of Pablo's death.

In affirming the judgment herein, the Court of Appeals stated:

"The district court's ruling on this allegation came directly from the pages of *Brown v. Hardin*, 197 Kan. 517, 523, 419 P.2d 912 (1966), where the court said:

'Human nature being what it is, if every wild expression of opinion made in a jury room in the throes of hammering out a verdict could be made the basis for retrial jury verdicts could seldom be preserved. Such inquiries into the validity of jury verdicts, based on mental processes of the jurors, are foreclosed in Kansas, formerly by case law, now by statute.'

"The statute to which the *Brown* court is referring is K.S.A. 60-441, which reads:

'Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined.' "

In this country great confidence is reposed in trial by jury. On the whole the system works well, and no one has devised a better system for securing justice. However, jurors are human beings and human nature being what it is, wild or "off-the-wall" statements are bound to be made during jury deliberations. For example, in a trial seeking damages for a whiplash injury, it would not be at all surprising that jurors might comment on the seriousness or lack thereof of whiplash injuries in acquaintances. If jury deliberations were tape-recorded and made available to counsel, there would doubtless be few unchallenged verdicts.

It is easy in this case to let some aspects of the facts obscure the real issues. In our health-conscious society which is constantly bombarded with health warnings, few lay people would not be alerted to a possible heart attack problem by just hearing about

Pablo's complained-of chest pains and numb arms. Assuming all plaintiff's statements as to how Dr. Winger's examination of Pablo was conducted are true (as opposed to Dr. Winger's versions), there is much to criticize in Dr. Winger's actions.

Pablo Saucedo's death was tragic. However, in order to find Dr. Winger liable therefor, the jury was properly advised it had to find Dr. Winger's conduct caused or contributed to Pablo's death or lessened his chance for survival. This specific question was asked of the jury. It deliberated six hours and answered the question in the negative. A "yes" answer would have had to be based upon expert testimony—evidence that was lacking herein.

I find no abuse of discretion in the trial court's denial of the motion for a new trial. The cocaine statement was a wild comment which has not been shown to have prejudiced the plaintiff's case under the facts herein. I would affirm the district court and the Court of Appeals.

SIX, J., joins the foregoing dissenting opinion.